SHULTHIS v. McDOUGAL et al.†

BERRYHILL v. SHULTHIS et al.

(Circuit Court of Appeals, Eighth Circuit. June 3, 1909.)

Nos. 2,901 and 2,905.

1. INDIANS (§ 18*)—LANDS—DEATH BEFORE ALLOTMENT—DESCENT UNDER STATUTE—"DESCEND."

Section 7 of the supplemental agreement with the Five Civilized Tribes of Indians (Act June 30, 1902, c. 1323, 32 Stat. 501), promulgated August 8, 1902, provides that "all children born to those citizens who are entitled to enrollment under previous acts, subsequent to July 1, 1900, and up to and including May 25, 1901, and living upon the latter date, shall be placed on the rolls made by said commission." Also, "if any such child has died since May 25, 1901, or may hereafter die before receiving his allotment of lands, and distributive share of the funds of the tribe, the lands and moneys to which he would be entitled if living shall descend to his heirs as herein provided to be allotted and distributed to them." *Held*, that the word "descend," which was technically inapplicable to the situation described, since the decedent would never be seised of the property, was used to indicate the character of the title or estate which passed to the heirs, it not being intended that they should take the property as an additional bounty from the tribe but by virtue of their heirship, their title being one of inheritance rather than of purchase, the situation being made the same by such provision as though the title had become vested in the decedent before his death.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 49; Dec. Dig. § 18.*

For other definitions, see Words and Phrases, vol. 3, pp. 2012–2014.]

2. INDIANS (§ 18*)—LANDS—DEATH BEFORE ALLOTMENT—DESCENT—"NEW ACQUISITION"—"FROM HIS FATHER."

The heirs who take under such provision and their estate are determined by Mansf. Dig. Ark. c. 49, which provides that, on the death of a person intestate, unmarried, and leaving no children, the estate, if it came from the father, shall go to the father, and if from the mother shall go to the mother, "but if the estate be a new acquisition it shall ascend to the father for his lifetime and then descend in remainder to the collateral kindred of the intestate." A child whose father was a member of the Creek Tribe, but whose mother was not, was born May 6, 1901, and died in November of the same year. He thus became entitled to enrollment in the tribe, but had not received his allotment at the time of his death. *Held* that, technically, the Arkansas statute did not apply to the situation, since the land to which the decedent was entitled and which was the common property of the tribe did not, strictly speaking, come to him by grant, inheritance, or purchase, but by a division of lands held in effect by a tenancy in common, to an interest in which he was born as a member of the tribe entitled to enrollment therein; but that, applying the statute by analogy, such land was not a "new acquisition," but came to him by the blood of his tribal parent, or, within the meaning of the statute, "from his father," and that therefore, on his death and the subsequent allotment his father took the full title, and not merely a life estate.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 49; Dec. Dig. § 18.*

For other definitions, see Words and Phrases, vol. 5, p. 4783.]

3. INDIANS (§ 15*)—LANDS—POWER TO CONVEY.

Such land having been in substance, although not technically inherited by the father from his son, the father had full power to sell and convey

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.
†Motion for rehearing pending.

the same after its allotment to him under Act April 26, 1906, c. 1876, § 22, 34 Stat. 145, which provides that "the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe * * * may sell and convey the lands inherited from such decedent."

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 15.*]

**4. INDIANS (§ 16*)—OIL AND GAS LEASES—NECESSITY OF RECORDING.**

Under Mansf. Dig. Ark. c. 27, extended to Indian Territory by Act Feb. 19, 1903, c. 707, 32 Stat. 841, and which provides that "no deed, bond or instrument in writing for the conveyance of any real estate or by which the title thereto may be affected in law or equity shall be good or valid against a subsequent purchaser * * * unless such deed, bond or instrument, duly executed and acknowledged or approved * * * shall be filed for record * * *," a so-called departmental lease executed by an Indian, giving the lessee the right for 15 years to explore for and extract oil and gas, is an instrument which must be recorded in order to be valid against a subsequent purchaser of the land without notice, although such lease was required by statute to be approved by the Secretary of the Interior and had not been so approved at the time of the sale of the land by the lessor.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 16.*]

**5. INDIANS (§ 16*)—OIL LEASE—VALIDITY AS AGAINST SUBSEQUENT PURCHASER.**

The filing of a copy of an oil and gas lease executed by an Indian in Indian Territory, at the Indian agency, required by the rules of the Interior Department, is merely for administrative purposes, and does not charge a subsequent purchaser of the land with constructive notice of such lease, especially where Congress had previously provided for the recording of such instruments and designated the places of record.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 16.*]

**6. VENDOR AND PURCHASER (§ 229*) — BONA FIDE PURCHASER — NOTICE OF INCUMBRANCE.**

Purchasers of a tract of land from an Indian inquired of him if he had ever signed any papers against the land, to which he replied that he had signed an old lease, but he thought it was no good because the parties came back and wanted him to sign new papers, which he refused to do. He was then asked who the parties were, but stated that he did not know. The purchasers then made a small payment, but refused to close the deal until they had procured an abstract of title which showed the land clear. *Held,* that they had done all that was required of them, and were not chargeable with notice of a prior unrecorded oil and gas lease.

[Ed. Note.—For other cases, see Vendor and Purchaser, Dec. Dig. § 229.*]

**7. VENDOR AND PURCHASER (§ 229*) — BONA FIDE PURCHASER — NOTICE OF INCUMBRANCE.**

Where a purchaser of land, having no notice of any incumbrance thereon, yet procured an abstracter to make inquiry at a place where oil leases were filed, but where he was not bound to inquire, and was told that there was nothing on file affecting the land, he is not chargeable with notice of an oil lease which was in fact there on file.

[Ed. Note.—For other cases, see Vendor and Purchaser, Dec. Dig. § 229.*]

Appeal from the Circuit Court of the United States for the Eastern District of Oklahoma.

For opinion below, see 162 Fed. 331.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

C. L. Thomas and Edgar A. De Meules, for Shulthis.

George S. Ramsey (P. C. West and N. A. Gibson, on the brief), for McDougal and others.

S. V. O'Hare (F. L. McCain, on the brief), for intervener, Berry-hill.

Before HOOK, Circuit Judge, and RINER and AMIDON, District Judges.

AMIDON, District Judge. This is a suit in equity brought by the appellant to determine conflicting rights to a parcel of real property situated in Oklahoma. While the cause was pending, George Franklin Berryhill was permitted to file a petition in intervention therein and make common cause with the complainant. The decree below dismissed the bill upon the merits. The case can best be presented by unfolding the facts and the law together.

Andrew J. Berryhill was the son of George Franklin Berryhill, a member of the Creek Nation of the mixed blood, and Clementine Berryhill, his wife, a noncitizen of that tribe. He was born on the 6th day of May, 1901, and died in the month of November of that year, leaving no brothers or sisters surviving him. At no time during his life was he entitled to enrollment as a member of the tribe, or to an allotment of its property. After his death, by the supplemental agreement entered into between the Commission to the Five Civilized Tribes and commissioners of the Creek Nation (Act June 30, 1902, c. 1323, 32 Stat. 501), proclaimed by the President August 8, 1902, it was provided in section 7, as follows:

"All children born to those citizens who are entitled to enrollment under previous acts, subsequent to July 1, 1900, and up to and including May 25, 1901, and living upon the latter date, shall be placed on the rolls made by said commission."

Andrew J. Berryhill met precisely the conditions of this agreement. He died, however, before the agreement was entered into, as already stated. But the agreement further made express provision for such a contingency in section 7, as follows:

"And if any such child has died since May 25, 1901, or may hereafter die before receiving his allotment of lands, and distributive share of the funds of the tribe, the lands and moneys to which he would be entitled, if living, shall descend to his heirs, as herein provided, and be allotted and distributed to them."

The phrase, "as herein provided," refers to chapter 49 of Mansfield's Digest of the Statutes of Arkansas, which deals with the subject of heirship and descent.

The word "descend" is, of course, inapplicable to the actual contingency provided for by the statute, because that contingency contemplates the death of the child before he had actually become seised of any interest in the land. The word "descend" is a word of art, and indicates the transference of property by inheritance. If any significance is to be given to it as used in this section, it must be held that the intent of the parties to the agreement was that the land should pass to the same persons and in the same proportions as it would have

passed if the child had died seised of it. Any other construction simply obliterates this word, and makes the land pass to the parties who are heirs directly by allotment from the tribe. The statute itself not only declares that it shall "descend," but also declares that it shall be "allotted and distributed," to the heirs. It is manifest, therefore, that both ideas were in the minds of the parties to the agreement.

This construction receives further support by the general scheme which the federal government and the Creek Nation formed for the disposition of the tribal property. The first requisite for the partition of the tribal estate in severalty among its members was to ascertain and legally establish who were members of the tribe. By reason of the many intermarriages between members of the tribe and members of the white and negro races, and by reason of the fraudulent claims to membership, the ascertainment of the particular persons who were in fact entitled to such membership proved a much more difficult task than was at first anticipated. The Commission was empowered and directed to prepare such a roll. This work not only required much investigation on its part, but resulted in voluminous litigation. Instead of being a work of months, it proved to be a work of years. In the meantime, however, the membership of the tribe was constantly undergoing change by birth and death. In order to provide for all members of the tribe who were born subsequent to the beginning of the enrollment, the date of right to enrollment was twice set forward, the statute last quoted fixing the latest date. By reason of these facts, when the roll was completed, it contained more names than there were members in being. The roll, however, furnished the basis for the division of the tribal estate. Every person whose name was entered on the roll was entitled to an equal proportion of the tribal land and funds; but by reason of the fact that before actual distribution could be made, and even while the enrollment was in progress, some persons whose names were on the roll would die, the statute made provision for the disposition of the share of tribal property which would go to them if living. Such a provision was necessary. Otherwise there would have been a portion of the tribal property undistributed. It was never the intent, however, either of the tribe or of the federal government to grant to parties having a kinsman who had died before the actual making of the allotment additional lands as a bounty. These kinsmen got all their right to additional lands under and through the enrolled member who had died. Whether the ancestor was actually seised of the property or not in his lifetime, was immaterial. It was the intent of the statute that the property should pass by the same right and in the same manner that it would have passed if the person enrolled had survived to receive his allotment. The tribe was not bestowing such land as a bounty, but was simply providing for the right of inheritance.

Congress itself has construed this statute. Section 5 of the act (Act April 26, 1906, c. 1876, 34 Stat. 138) provides:

"That all patents or deeds to allottees in any of the Five Civilized Tribes to be hereafter issued, shall issue in the name of the allottee; and if any such allottee shall die before such patent or deed becomes effective, the title to the lands described therein shall inure to and vest in his heirs; and

in case any allottee shall die after the restrictions have been removed, his property shall descend to his heirs or his lawful assigns, as if the patent or deed had issued to the allottee during his life; and all patents heretofore issued where the allottee died before the same became effective, shall be given like effect."

Here is an express declaration by Congress that the land shall descend to heirs the same as it would have descended if the patent or deed had issued to the allottee during his life, and it is declared that allotments for allottees who have died shall also thus descend. This interpretation by Congress of its own act leaves no room for doubt as to its intent.

We must, therefore, look to chapter 49 of the Arkansas statute both to ascertain who the heirs are, and what estate they shall take in the property. That statute does not treat of the subject of heirship independently, but combines that subject with the estate to pass by inheritance. Subsection 2 of section 2522 provides as to the general estate, both personal and real, of a person dying intestate, and having no children, that it shall go to the father. This section, however, is to be read in connection with section 2531, which deals with the subject of the devolution of property when there is no heir of the blood to whom it can descend. Under this statute, if the deceased person came by the estate from his father, it is to go to the father, and, if he came by it from his mother, it goes to the mother. The statute then proceeds:

"But if the estate be a new acquisition, it shall ascend to the father for his lifetime, and then descend in remainder to the collateral kindred of the intestate in the manner provided in this act."

This statute makes provision for all possible acquisitions of real property for the civilized white community whose estates it was intended to govern. Among the people of Arkansas there was no way of acquiring land except by grant, gift, or inheritance. This was true even of lands acquired from the federal government under the public land laws. The patentee of such lands was always required to purchase the same either by residence and improvement, or the payment of a purchase price, or by these elements combined. It needs but a moment's thought to see that, when this statute was applied to the lands of the Creek Nation, it was applied to a subject-matter entirely different from that which was in the mind of the Legislature of Arkansas. The lands of that tribe fit into neither of the classes mentioned in the statute. They did not come to a member of the tribe by inheritance from any ancestor, nor could they be spoken of with propriety as a purchase. In applying the statute in this case, therefore, we shall have to proceed by analogy only. The tribal lands belonged to the tribe. The legal title stood in the tribe as a political society; but those lands were not held by the tribe as the public lands of the United States are held by the nation. They constituted the home or seat of the tribe. Every member, by virtue of his membership in the tribe, was entitled to dwell upon and share in the tribal property. It was granted to the tribe by the federal government not only as the home of the tribe, but as a home for each of the members. From the time they took up their residence west of the Missis-

sippi, the Constitutions of the Five Nations provided that their land should remain "common property; but the improvements made thereon, and in the possession of the citizens of the nation, are the exclusive and indefeasible property of the citizens respectively who made, or may rightfully be in possession of them." The term "improvements," as here used, meant not only betterments, but occupancy. Cherokee Nation v. Journeycake, 155 U. S. 196, 210, 15 Sup. Ct. 55, 39 L. Ed. 120. These "improvements" passed from father to son, and were the subject of sale, with the single restriction that they should not be sold to the United States, individual states, or to individual citizens thereof. Under such regulations the members of the Creek Nation had been in possession of homes on their tribal lands for more than half a century. The portion of their lands which were not occupied in severalty, as well as the tribal funds, were treated as belonging to the members, and all income derived therefrom was distributed among them per capita. While the legal title to the tribal property belonged to the tribe as a political society, the beneficial use of the same had at all times belonged to the members in severalty. It was to such a condition of life and property as this that the plan of allotment here involved was to be applied. Its controlling principle is a clear recognition that each member of the tribe, by virtue of his membership, was entitled to an equal share in all the tribal property. To carry out the scheme, the law first proceeds on the one hand to ascertain the membership of the tribe, and on the other the actual present value of its property, and then directs that the tribal property be divided per capita so that each member shall receive an equal share thereof, according to its true value. The right to such a share is not created by the statutes, but is simply recognized and enforced by them. The several agreements and acts of Congress are not concerned with the legal title, but go back to the actual beneficial rights of property as they had always existed in Indian Territory. They require allotments to be made so as to save to each member his improvements, including his right of occupancy. While the tribe in carrying out the project grants the legal title to the property, it does not confer the right to that property. The act by which the distribution is made is spoken of not as a grant, but as an allotment. We are not departing from the well-established doctrine of the Supreme Court that the lands of these Indians belong to them as a political society and not to the individual members. Cherokee Trust Funds, 117 U. S. 288, 308, 6 Sup. Ct. 718, 29 L. Ed. 880; Delaware Indians v. Cherokee Indians, 193 U. S. 127, 24 Sup. Ct. 342, 48 L. Ed. 646. So long as the tribal relations continued, a member had no right to have a share of the tribal property set off to him as his private, separate estate, for the constitutional policy of the tribe was ownership in common. But when, as here, the time came to disband the tribe, its ownership as a political society could no longer continue, and the division of its property was far more nearly akin to the partition of property among tenants in common than the grant of an estate by a sovereign owner. Under such a scheme it cannot be said that the property which passed to an allottee is a new right or acquisition created by the allotment. The right to the property antedates the allotment,

and is simply given effect to by that act. Viewing the tribal property and its division in this light, Andrew J. Berryhill acquired his right to the land in question by his membership in the tribe. It was his birthright. It came to him by the blood of his tribal parent, and not by purchase. In applying the Arkansas statute, we shall accomplish the purpose of Congress and the Creek Nation best by treating the lands not as a new acquisition by him, but as an inheritance from his parents as members of the tribe. His father was the only parent through whom he derived his right, and to the father the land should pass. If the mother had been a member of the tribe, then the land should properly pass to the parents equally. From this premise it necessarily follows that George Franklin Berryhill succeeded to the entire estate of the property in question.

We next pass to the rights of the parties to this controversy under the conveyances from George Franklin Berryhill. On June 5, 1906, he and his wife executed a warranty deed of the property to Edmund and Perry McKay in consideration of the sum of $2,000. It is now contended that this deed was void because at the time of its execution the grantor was without legal capacity to make such a conveyance. It is conceded that George Franklin Berryhill had only such power to dispose of the lands in question as was granted to him by act of Congress. Both parties base their right upon section 22 of the act approved April 26, 1906, which reads as follows:

"That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe, * * * may sell and convey the lands inherited from such decedent."

George Franklin Berryhill and appellant Shulthis make the same argument upon this statute that they did upon section 7, above quoted. It is urged that the land in question is not "inherited" land. For reasons already explained, that contention, while technically right, is substantially wrong. The scheme of the statute clearly indicates that the land was to be regarded the same as if it had been inherited. No sound reason can be adduced for treating these lands otherwise than they would have been treated if Andrew J. Berryhill had survived long enough to receive the allotment. This interpretation is further supported by the provision of the several acts dealing with these allotments. Every member of the tribe was allotted a share in the tribal lands. Such allotment is repeatedly spoken of in the act as his "homestead." It was intended to be such, and to serve as a sure basis for his own support and the support of his family, either actual or prospective. To protect this homestead, it was made inalienable for the term of five years. The reasons for making it inalienable did not apply to lands obtained by inheritance, and for that reason the statute last quoted was passed granting power to convey the same. The lands here in question fall under the same policy as lands obtained by inheritance, and the statute should be held to apply thereto. Berryhill, therefore, had power to make the deed to the McKays.

The remaining question relates to the priority of the conflicting claims of appellant, Shulthis, and the appellees who have succeeded to the rights of the McKays. March 24, 1906, George Franklin Ber-

ryhill, under the power granted by section 17 of the act of Congress: approved June 30, 1902, c. 1323, 32 Stat. 504, and the rules of the Land Department made pursuant thereto, executed to appellant, Shul- this, what is known as a "departmental lease," granting to him the right to explore for and extract oil and gas from the land in question for the period of 15 years. This lease, at the time it was executed, required for its completion the approval of the Secretary of the In- terior. Pursuant to rules on the subject, it was executed in quadrupli- cate, one part to be sent to the Secretary of the Interior, another to be filed in the office of the Indian agent at Union Agency, Muskogee, and the other two parts to be retained by the lessor and lessee. One month later, to wit, April 26, 1906, the act was passed which empowered Berryhill to sell and convey the land absolutely without the approval of the Secretary of the Interior (section 22, c. 1876, 34 Stat. 145). June 5th following, Berryhill and his wife, in consideration of the sum of $2,000, executed and delivered the warranty deed to the Mc- Kays. The lease to Shulthis was approved by the Secretary of the Interior about a year later, namely, April 21, 1907. It will be seen that the deed was given about a month after the lease. Was it sub- ject to the lease? The lease was not recorded, and to answer this question we must first inquire whether it was subject to the registra- tion law then in force in Indian Territory; for if it was not subject to that law, its priority in time would give it priority of right over the deed. By Act Feb. 19, 1903, c. 707, 32 Stat. 841, Congress ex- tended the registration law of Arkansas, being chapter 27 of Mans- field's Digest, to the Indian Territory, and divided the territory into registration districts. It imposed upon the clerk or deputy clerk of court of those districts the duty to record, in books provided for that purpose, "all deeds, mortgages, deeds of trust, bonds, leases, cove- nants, defeasances, bills of sale, and other instruments of writing of, or concerning lands, tenements, goods or chattels." Section 671 of Mansfield's Digest also provides as follows:

"No deed, bond or instrument in writing, for the conveyance of any real estate, or by which the title thereto may be affected in law or equity, shall be good or valid against a subsequent purchaser of said real estate for a valuable consideration, without actual notice thereof, * * * unless such deed, bond or instrument, duly executed and acknowledged, or approved, as is or may be required by law, shall be filed for record in the office of the clerk and ex-officio recorder of the county where such real estate may be situated."

Did the lease come within the class of instruments specified in these statutes? Was it an instrument by which the title of real estate "may be affected in law or equity"? We think it was. While it required the approval of the Secretary of the Interior before it became in all respects binding, that approval was intended solely to protect the Indian against improvidence. When the lease was executed and de- livered, it created an inchoate interest in the land which by the ap- proval of the Secretary became absolute without any further act of the parties. Even after the approval, there would have been nothing to record but the lease. By the doctrine of relation, the leasehold estate upon the approval of the lease, had its beginning at the date of the execution and delivery of the instrument. Either the lease creat-

ed an equitable interest in the property in favor of the lessee at the time it was executed and delivered, or the lessee had no interest whatever in the property until the lease was approved. But if we should accept the latter alternative, the lease would be subsequent to the deed and in all respects subordinate to it, regardless of the registration law. A question almost identical with the one we are considering was before the Supreme Court in the case of Lomax v. Pickering, 173 U. S. 26, 19 Sup. Ct. 416, 43 L. Ed. 601. That involved a deed by an Indian, which by act of Congress, as well as the patent conveying the land to the Indian, was subject to the following restriction:

"But never to be leased or conveyed by him, them, his or their heirs, to any person whatever, without the permission of the President of the United States."

The land was situated in Illinois. The registration law of that state was by no means as comprehensive as the statutes above quoted; yet the Supreme Court of Illinois held that the deed upon its execution and delivery, and before it was approved by the President, was an instrument so affecting the title to real property as to require its registration. Speaking of this ruling, the federal Supreme Court used the following language:

"Even if this be not a construction of the state statute binding upon us, and decisive of the case, we regard it as a correct exposition of the law."

This decision, in our judgment, controls the question we are now considering, and under it the lease was subject to the registration law in force in the territory, and should have been recorded in order to protect the interest which it granted as against a good-faith purchaser. This is not a case in which the title to land is in the government and a proceeding is pending before the Land Department for its acquisition under the public land laws. The title to the land here was in Berryhill, and the object of the supervisory approval of the Secretary of the Interior was simply to protect the Indian against the improvident disposition of his property. Pickering v. Lomax, 145 U. S. 310, 316, 12 Sup. Ct. 860, 36 L. Ed. 716. We can attach no weight to the suggestion of counsel that Shulthis could not record his lease, because under the rules of the department one copy was to be delivered to, and retained by, him. The lease under such circumstances occupied precisely the same position as a deed. He could have filed it in the proper office for record, and upon its being recorded it would have been returned to him as the muniment of his right.

This leaves only the question whether appellants acquired their title with actual or implied notice of the lease. It is first urged that we should hold that they had implied notice, by reason of the fact that a copy of the lease was, pursuant to the rules of the Secretary of the Interior, filed with the Indian agent at Union Agency, Muskogee. That filing, however, was purely for administrative purposes, to aid the Land Department in supervising the leasing of these Indian lands. There was no rule or statute which made such filing notice to parties acquiring an interest in the property. Neither had such parties any right, as a matter of law, to examine the records at the Indian agency, or to take copies thereof. The evidence itself shows that peo-

ple dealing in oil and gas leases were accustomed to consult the agency records, and that, if inquiry was made there as to whether a given Indian had executed a lease of his property, the clerks in charge of the records would give such information as the records contained on the subject. This information, however, was given as a matter of courtesy, and not pursuant to any legal duty. Congress had already provided carefully for an official record of all instruments in any way affecting the title to real property, and had directed intending purchasers to that record for information. We cannot believe, therefore, that the rule of the Secretary of the Interior requiring a copy of such leases to be filed with the Indian agent could create another official record to which intending purchasers were bound to resort at their peril. That record could become notice to a purchaser only by proof that he actually consulted it and learned its contents before acquiring his interest in the property. The evidence affirmatively shows that the McKays knew nothing of the practice of filing leases at the Indian agency, and made no investigation there. They are therefore unaffected by that record.

Did the McKays have actual notice of the lease? The evidence as to the facts known to them on this subject, and the inferences properly deducible from such facts, are in direct conflict. Berryhill testified that the lease to Shulthis was obtained by two parties by the name of McElwane and Chaney, and that he himself did not know that the lease was in favor of Shulthis, but supposed it ran to McElwane. There was either some actual or supposed defect in the lease, and Chaney came repeatedly to the Indian urging him to execute new papers, which he refused to do. From this experience he came to believe that the lease was void. During the negotiations between him and the McKays for the sale of the land, they inquired of him whether there was anything against the property. His testimony as to what then took place is as follows:

"Q. Just go ahead and tell what you told them at the time you had this trade? A. Well, I didn't tell a great deal about it; I told them they had a oil and gas lease on it, and at the time I didn't believe it was any good, and I believe that was all.

"Q. Did you tell them why you didn't believe it was any good? A. Yes, sir.

"Q. Why did you tell them? A. Because they come back and wanted me to change my woman's name, and we didn't do it.

"Q. Did you tell them who took that lease? A. Told them who had it.

"Q. Who did you tell them? A. McElwane and Chaney."

Both of the McKays testified as witnesses in the case. The substance of their evidence is that, in response to their inquiry as to whether there was anything against the land, he at first said there was nothing, but afterwards stated that he had signed an old lease some time ago, but it was not any good; he said he knew, because the parties for whom he had signed this lease had come back after him and wanted him to sign up new papers, and, when asked the names of the parties to whom he had given the papers, he answered that he didn't know. This is the testimony of one of the McKays, and the other stated in substance as follows:

"We asked him if he had ever made any deal on his land or signed any papers of any kind against the land. He first said he had not signed any papers, and then he said afterwards that he did sign some kind of papers, but he didn't know who they was to, or what they meant, and they came back to him and wanted him to sign them over again, and he would not do this. He didn't know the name of the parties to whom he had made the papers. I remember of asking him who he had signed papers with, and he said he didn't know."

It appears from Berryhill's evidence that he did not know McElwane, the party to whom he supposed the lease ran, but did know Chaney. Upon receiving the above information the McKays paid a small part of the consideration, and declined to pay the balance until they had obtained an abstract of title to the property. This they immediately did, and the abstract showed the title to be clear. They then went forward and paid the balance of the consideration. This evidence makes a close case on the question of notice. If Berryhill in fact told the McKays the name of the parties to whom he had executed the papers, they, of course, could not have accepted his statement that the papers were invalid, but would have been charged with · the duty of consulting the other parties to the transaction, and ascertaining from them the nature and extent of their rights. Failure to do so would have impressed the land in their hands with all the rights of those parties. The question of notice, therefore, turns upon whether the preponderance of the evidence shows that the McKays knew, or could by the exercise of reasonable care have ascertained, the name of the parties holding these outstanding rights. The testimony of the McKays on this point is directly in conflict with that of Berryhill. They state that they inquired of him directly the names of the parties to whom he had executed these papers, and that he told them that he did not know who they were. We accept their testimony as the more credible on this question for the following reasons: First, witness for witness, they are certainly as trustworthy as Berryhill. Second, Berryhill at the time was anxious to consummate the sale of the land to them. He thus had a strong motive to conceal from them any knowledge which would be likely to defeat that purpose. His native shrewdness would teach him that, if he disclosed the name of Chaney, the McKays would consult him, and thus ascertain the state of the title and decline to consummate the purchase. Third, the McKays were farmers. There is no evidence in the record that they purchased the land for oil and gas purposes, or for any other purpose than agriculture. They had never themselves had anything to do with oil and gas leases, and for that reason knew nothing about the filing of such leases with the Indian agent, or that it was possible to learn from that source what leases an Indian had given. Fourth, the evidence contains convincing proof that they did not shut their eyes against ascertaining the existence of the outstanding rights referred to by Berryhill, in order that they might not learn the truth. On the contrary, they took the very steps which would have been taken by a prudent business man to ascertain the state of the title. Instead of consummating the purchase, they suspended the transaction, and ordered an abstract. They had good reason to believe that, if there was any outstanding instrument affecting the title to the property, the

records would disclose that fact. The abstract showed the title to be clear. This was strong confirmation of what Berryhill had told them that the papers which he had executed were "no good," and were so regarded by the parties to whom they had been given. Upon this showing we are of the opinion that the McKays acted in good faith in accepting the deed and paying the purchase price. They exhausted the sources of information that had been disclosed to them, and what they discovered was such as would have led a man of reasonable prudence to believe that the title to the property was clear. 2 Pomeroy's Equity Jurisprudence, p. 1008, note 1. The mere knowledge that papers had been previously executed which might affect the title to real property will not necessarily defeat the claim of a good-faith purchaser. In Stanley v. Schwalby, 162 U. S. 255, 16 Sup. Ct. 754, 40 L. Ed. 960, the purchaser employed counsel to examine the title. In the course of his investigation he learned as a fact that the land had been previously sold, but there being no conveyance of record, and the transaction being an old one, he reached the conclusion that the title of the vendor was good, and so reported to his principal. The Supreme Court, though holding that the principal was charged with all the knowledge possessed by his agent, still decided that the vendee was entitled to the protection of a good-faith purchaser. Speaking to this question, it said:

"In order to charge a purchaser with notice of a prior unrecorded conveyance, he or his agent must either have knowledge of the conveyance, or at least of such circumstances as would by the exercise of ordinary diligence and judgment lead to that knowledge; and vague rumor or suspicion is not a sufficient foundation upon which to charge a purchaser with knowledge of a title in a third person. Notice of a sale does not imply knowledge of an outstanding and unrecorded conveyance."

In the case of United States v. Detroit Lumber Co., 200 U. S. 321, 26 Sup. Ct. 282, 50 L. Ed. 499, the suspicious circumstances were much stronger than in the present case, but the Supreme Court refused to charge the purchaser with notice, using the following language:

"A chancellor will not be astute to charge a constructive trust upon one who has acted honestly and paid a full and fair consideration without notice or knowledge. On this point we need only to refer to Sugden on Vendors, p. 622, where he says: 'In Ware v. Lord Egmont, 4 De Gex, M. & G. 460, the Lord Chancellor Cranworth expressed his entire concurrence in what, on many occasions of late years, had fallen from judges of great eminence on the subject of constructive notice, namely, that it was highly inexpedient for courts of equity to extend the doctrine. When a person has not actual notice, he ought not to be treated as if he had notice, unless the circumstances are such as enable the court to say, not only that he might have acquired, but also that he ought to have acquired it, but for his gross negligence in the conduct of the business in question. The question, then, when it is sought to affect a purchaser with constructive notice, is not whether he had the means of obtaining and might by prudent caution have obtained the knowledge in question, but whether not obtaining it was an act of gross or culpable negligence.'"

See, also, the same case in this court, 131 Fed. 668, 674, 67 C. C. A. 1.

The position of the assignees of the McKays, however, is more favorable than their own. The evidence shows affirmatively that in

October, 1906, the McKays executed an oil and gas lease of the property to Arthur B. Reese, under whom the other defendants claim. The rule is well settled that, if Reese took without notice of plaintiff's lease, his title would be good though his vendor had such notice. Stanley v. Schwalby, 162 U. S. 255–283, 16 Sup. Ct. 754, 40 L. Ed. 960. At the time Reese accepted his lease, he inquired of the McKays whether there was any outstanding claim against the property, and was told by them that there was not. In proof of their statement they exhibited to him the abstract of title showing the land to be clear. Reese also caused inquiry to be made of the Indian agency as to whether any oil and gas leases appeared of record there, and received a certificate from an abstracter who made the inquiry on his behalf that no such lease had been filed. Reese had no actual knowledge of any fact or circumstance which put him upon inquiry, as to the existence of any prior lease or claim. Complainant seeks to charge him with notice because he in fact made inquiry at the Indian agency where the lease was filed, but failed to discover its existence. It is charged that his investigation there was negligent, and that he is therefore impressed with notice of all that he would have discovered if he had made proper inquiry. The answer to such a claim is this: Reese was charged with no duty of inquiring at the agency. An ineffectual inquiry, therefore, cannot place him in a worse position than he would have been if he had made no inquiry at all. But again, we think that he is not properly chargeable with negligence. He applied to an abstracter to ascertain from the files of the agency whether any lease appeared there against the property, and received a written statement from him that no such lease was on file. This surely was the exercise of such care as a reasonable and prudent business man would have exercised under the same circumstances. For reasons which we have already explained, the records at the Indian agency had no force to impart constructive notice. The evidence is clear that neither Reese nor his agent at the time he took his lease had any actual knowledge of what appeared upon those records. Inasmuch as he was under no legal duty to search at the agency, his ineffectual effort to ascertain the state of its files certainly cannot place him in the same position as he would have occupied if he had obtained actual knowledge of the lease.

From a careful examination of the evidence we are of the opinion that the defendants are entitled to the protection of good-faith purchasers as against complainant's lease. The decree, therefore, of the trial court was right, and it is affirmed.

RINER, District Judge, concurs in the result.