## YOUNGKEN et al. v. DAVID et al.

### (District Court, E. D. Oklahoma. June 17, 1916.)

### No. 2175.

1. INDIANS ⬚15(2)—LANDS—ALIENATION BY HEIRS.

Act April 26, 1906, c. 1876, § 22, 34 Stat. 145, provides as follows: "The adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe * * * may sell and convey the lands inherited from such decedent. * * * All conveyances made * * * by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior." *Held*, that such provision applies only to lands which had been or should thereafter be selected by or patented to the decedent during his or her lifetime, and does not apply to land selected by an administrator under section 20° of the Cherokee Agreement July 1, 1902, 32 Stat. 716, and on behalf of an Indian who died without having received his allotment, and that such lands are alienable by the heirs without restriction under prior legislation.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 39; Dec. Dig. ⬚15(2).]

2. INDIANS ⬚15(1)—LANDS—ALIENATION BY HEIRS.

Act April 26, 1906, c. 1876, § 19, 34 Stat. 144, which provides that no full-blood Indian of any of the Five Tribes shall have power to alienate "any of the lands allotted to him" for a period of 25 years, applies only to lands allotted to an Indian in his own right as his share of the tribal lands, and does not apply to land allotted to him as heir on behalf of a deceased member.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 37, 38; Dec. Dig. ⬚15(1).]

In Equity. Suit by J. H. Youngken and others against Nellie David and others. Decree for complainants.

L. J. Roach, of Muskogee, Okl., for complainants.

D. H. Linebaugh, U. S. Atty., of Muskogee, Okl., Paul Pinson, Special Asst. U. S. Atty., of Atoka, Okl., and James C. Denton and Frank Lee, both of Muskogee, Okl., for defendants.

CAMPBELL, District Judge. The statement of facts involved in this case and the chief contentions of the parties as set forth in the brief of counsel for plaintiffs will be adopted, from which it appears that:

"Stephen David, an enrolled Cherokee full blood, died intestate September 30, 1903, without having selected an allotment. He left surviving a widow, five adult daughters, and a minor grandson, the son of a deceased daughter. The widow, Nellie David, and one daughter, Nancy Ghormley, were enrolled as of three-quarter blood, while the four other daughters and the grandson were enrolled as full-blood Cherokees.

"An administrator was appointed, who, on August 2, 1905, selected a portion of the allotment to which the heirs of Stephen David were entitled, under section 20 of the Cherokee Agreement, providing that: 'If any person whose name appears upon the roll prepared as herein provided shall have died subsequent to the first day of September, nineteen hundred and two, and before receiving his allotment, the lands to which such person would have been entitled if living shall be allotted in his name, and shall, with his

proportionate share of other tribal property, descend to his heirs according to the laws of descent and distribution as provided in chapter 49 of Mansfield's Digest of the Statutes of Arkansas: Provided, that the allotment thus to be made shall be selected by a duly appointed administrator or executor.'

"For some reason the administrator did not select the balance of the allotment until May 28, 1907. This latter portion of the allotment is the land now in controversy. On November 5, 1907, the widow and the five adult heirs executed a warranty deed, conveying this land to John D. Scott and Horace M. Adams. A consideration of $200 was paid to each grantor. This deed was never presented for approval, or approved, either by the Secretary of the Interior or by a county court, the grantees deeming approval unnecessary.

"In December, 1907, the legal guardian of the minor grandson presented a petition to the county court of Cherokee county, reciting this conveyance by the adult heirs; that Scott and Adams had offered to pay the minor $200 for his interest; that a deed had been executed by the guardian to Scott and Adams; and asking that this deed be approved by the court. It was so approved on December 30, 1907. On March 31, 1909, Adams conveyed his interest in the land to Scott, and on January 28, 1915, Scott conveyed to the plaintiff J. H. Youngken. Scott died on March 4, 1915, and the plaintiff Youngken is the administrator of his estate. On October 9, 1909, almost two years subsequent to the deed to Scott and Adams, the widow and the five adult daughters and the minor grandson, by his legal guardian, executed an oil and gas lease on the land to F. W. Galer. This lease was in departmental form, and was approved by the Secretary of the Interior on January 10, 1910. On April 18, 1910, it was assigned by Galer to the defendants Knight & Gillcoat. Knight & Gillcoat have developed the land, and produced considerable quantities of oil. From August 1, 1910, until March, 1912, the one-eighth royalty due the owner of the land was paid to the Indian agent. In March, 1912, the agent advised the Prairie Oil & Gas Company, which was purchasing the oil, that a question had arisen concerning the right of the department to supervise the lease, and that until that question was settled the Prairie Company might retain the royalties. All royalties accruing since March, 1912, are in the hands of the Prairie Company, and the land is producing oil at the present time.

"The plaintiff contends that the land in controversy, being allotted under section 20 of the Cherokee Agreement, on behalf of the heirs of an enrolled citizen who died before receiving his allotment, was at all times unrestricted as to alienation by the heirs; that the conveyance by the adult heirs required no departmental or other approval; that the conveyance of the interest of the minor has been properly approved by a county court; and that the deeds from the adult heirs, and the minor, by his guardian, in November and December of 1907, conveyed good title to the plaintiff's grantors; that the department has never had, and has not now, any right to supervise the land or the royalties arising therefrom; that the title of the plaintiff, J. H. Youngken, should be quieted as against the widow and other heirs, all of whom are made defendants; that the plaintiff, J. H. Youngken, personally is entitled to recover the royalties which have accrued since he purchased the land; and that Youngken, as administrator of the estate of John D. Scott, deceased, is entitled to recover for the estate the royalties which accrued while the land was owned by Scott.

"The answers of the several Indian defendants and of the superintendent allege that the land was restricted for the reason that it was not selected by the administrator of Stephen David, deceased, until after April 26, 1906. It is insisted that sections 19 and 22 of the act of that date, or one of such sections, imposed restrictions upon alienation, or subjected any conveyance by the heirs to approval by the Secretary of the Interior."

It will be noted that the portion of the allotment involved in this case was not selected by Stephen David's administrator until after the act of April 26, 1906 (34 Stat. L. 137), became effective. Had it been selected before the passage of that act, there would be no question

of the right of these heirs to alienate it without restrictions, at least up to the time of the passage of the act referred to. Section 20, Cherokee Treaty (32 Stat. L. 716); Mullen v. United States, 224 U. S. 448, 32 Sup. Ct. 494, 56 L. Ed. 834; Skelton v. Dill, 235 U. S. 206, 35 Sup. Ct. 60, 59 L. Ed. 198; Adkins v. Arnold, 235 U. S. 417, 35 Sup. Ct. 118, 59 L. Ed. 294; Mallory-Bushyhead Case (affirmed by Circuit Court of Appeals, 237 Fed. ——, —— C. C. A. ——), decided by this court without written opinion.

This land was selected and the conveyances relied upon by the plaintiffs were made before the passage of Act May 27, 1908, c. 199, 35 Stat. 312, so that the question is confined to a consideration of the applicable portions, if any, of the act of April 26, 1906. Counsel for defendants contends, however, that as to the interest in this land of those of the aforementioned heirs of Stephen David who are full-blood Indians it is made inalienable except with the approval of the Secretary of the Interior by section 22 of the act of April 26, 1906, reading as follows:

"That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States court for the Indian Territory. And in case of the organization of a state or territory, then by a proper court of the county in which said minor or minors may reside or in which said real estate is situated, upon an order of such court made upon petition filed by guardian. All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe."

[1, 2] It is contended that this section applies, not only to a case where the selection of the deceased Indian's allotment had been made or a patent had issued to him during his lifetime, but also to a case like the one at bar, where he had died prior to such selection or issuance of patent, and where such selection is made by administrator or executor, as provided in section 20 of the Cherokee treaty above quoted. A careful consideration of section 22 of the act of April 26, 1906, in the light of controlling decisions, convinces that it will not bear the construction contended for by counsel for defendants. The very language of the section confines its effect to allotments of deceased Indians which had been, or shall be, selected by or for or patented to such Indians prior to their death. The lands affected in each case are those "inherited from such decedent." The purpose of the section is to apply its provisions to such lands in the hands of heirs of Indians already deceased at the time of its passage or who shall thereafter die. Hence the language, "his or her share of the land of the tribe to which he or she belongs or belonged." The manifest object of this section is to relieve the lands referred to from existing restrictions upon alienation. Allotments selected by or for or patented to living Indians of the several tribes affected by this legislation as their allottable share of the lands of any such tribe were, at the time of the passage of the act in question, restricted as to alienation either

by such allottee or his heirs, by virtue of the several prior acts of Congress relating to such tribes respectively. The effect of this act was to relieve the heirs from such restrictions except as to minors and full bloods, as to whom there was a qualified removal of such restrictions. On the other hand, by existing legislation relating to these several tribes the lands selected by or for or patented to heirs of deceased Indians dying prior to such selection or patent, being lands to which such deceased Indians would be entitled if living, were taken and held by such heirs free from all restrictions. Hence as to such lands there was no necessity of legislation removing restrictions.

Counsel for defendants cites as authority the case of Sampson v. Staples, decided by the Oklahoma Supreme Court, 155 Pac. 213. In this case it appears that Louisiana Sampson was a Mississippi Choctaw who died in 1903. It is stated that after her death, and prior to April 26, 1906, "Allotment designations were made for said allottee covering the land in controversy." Allotment certificates were issued therefor in 1907 and patents in 1909. Conveyances were thereafter made by the full-blood heirs without either the approval of the Secretary of the Interior or of the county court. It is held that under section 22 of the act of April 26, 1906, these conveyances were invalid, citing as authority: Tiger v. Western Investment Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738, United States v. Western Investment Co., 226 Fed. 726, 141 C. C. A. 482, and Brader v. James (Okl.) 154 Pac. 560. But the lands involved in each of the cases cited were selected and allotted to Indians in their lifetime who afterwards died, and the question involved in each case was the right of the heirs of such deceased Indians to alienate without the approval of the Secretary of the Interior or the county court. So that they are not really authority for the holding in Sampson v. Staples, and, for reasons heretofore given, I cannot agree with the conclusion reached in that case.

By section 19 of the act of April 26, 1906, it is provided:

"That no full-blood Indian of the Choctaw, Chickasaw, Cherokee, Creek or Seminole Tribes shall have power to alienate, sell, dispose of, or incumber in any manner any of the lands allotted to him for a period of twenty-five years from and after the passage and approval of this act, unless such restriction shall, prior to the expiration of said period, be removed by act of congress."

Under the provisions of section 20 of the Cherokee Agreement above quoted the land in controversy passed directly from the tribe to the heirs of Stephen David by operation of law, although it may have been nominally allotted and patented in the name of Stephen David, as provided by that section, for at the time of such allotment he was dead. Hence it might be contended that this was an allotment to the heirs, and that as to such of them as are full bloods section 19 applies as to "lands allotted to them." Such contention, however, would not be sound, for the reason that when section 19 is considered, as it must be, in connection with all preceding legislation passed by Congress relating to the allotment of the lands of the Five Civilized Tribes, it is apparent that this section must be confined in its effect to the lands which a member of the tribe receives as his allottable

share of the lands of the tribe by virtue of his membership therein, and not to the lands he receives by virtue of a provision whereby as an heir of another member of the tribe dying before receiving his allottable share of the tribal lands such lands passed to him as such heir. While in such case such lands may be, in a general sense, allotted to him, they are not allotted to him in the sense of that term as applied to the aliquot part of the land which every living member receives as his allotment or division of the lands of the tribe. This distinction is made manifest by the United States Supreme Court in Skelton v. Dill, supra. This case involved the question whether the full-blood heirs of a Creek ancestor, entitled to an allotment of land in that tribe, but dying before receiving the same, could alienate the lands allotted to them as heirs of such ancestor without the approval of the Secretary of the Interior. They took such lands by virtue of section 28 of the Original Creek Agreement (31 Stat. L. 861), which provided that in such case such lands should "descend" to the heirs and be "allotted" and distributed to them. By section 16 of the Supplemental Creek Agreement (32 Stat. L. 500) it was provided that "lands allotted to citizens" should be subject to certain restrictions upon alienation, but the court held that these restrictions applied only to allotments made to living citizens in their own right, and did not apply to allotments made on behalf of deceased members. No reason is perceived why any different signification should be given to the term "allotted" in section 19 of the act of April 26, 1906, than is given by the Supreme Court to the same term in section 16 of the Supplemental Creek Agreement. To construe either section 19 or 22 of the act of April 26, 1906, as applying to lands held by full-blood Indians by virtue of being heirs of tribal members dying before receiving such lands in allotment would be to impute to Congress the intention to reimpose restrictions upon such lands as had gone into the hands of such heirs prior to the passage of the act, for, as we have seen, up to that time such lands were unrestricted. But this, it is held, is not within the power of Congress to do. Bartlett v. United States, 203 Fed. 410.

It is true that in Shulthis v. McDougal (C. C.) 162 Fed. 331, decided in 1908, this court gave to section 22 of the act of April 26, 1906, the construction now contended for by defendant's counsel, which was apparently approved by the Circuit Court of Appeals in the same case on appeal. 170 Fed. 529, 95 C. C. A. 615. But a reconsideration of the section in the light of controlling decisions of the Supreme Court and Circuit Court of Appeals since the decisions in Shulthis v. McDougal were rendered forces the conclusion that the construction placed upon the section in that case was wrong.

It follows that the conveyances from the heirs of Stephen David, under which the plaintiffs claim, were valid so far as concerns the right of such heirs to alienate the lands in controversy free from restrictions. Decree may therefore enter for the plaintiffs.