JARVIS et al. v. GOFORTH et al.

No. 19114. Opinion Filed Sept. 9, 1930.

Rehearing Denied Feb. 10, 1931.

Wm. Neff and Fred Branson, for plaintiff in error.

Robert L. Gordon, Geo. S. Ramsey, Edgar A. deMeules, Villard Martin, Garrett Logan, J. B. Campbell, J. Ralph Knight, R. J. Roberts, and Virgil Biggers, for defendants in error.

HEFNER, J. Ida was a male citizen of the Seminole Nation and died in 1905, intestate, without issue and was never married, and was the owner of the land allotted to him at the time of his death. Samsochee was his father and Muttee was Samsochee's father and the paternal grandfather of the intestate. Co-ho-kee was Samsochee's mother and Ida's paternal grandmother. He was survived by three sisters of Muttee, who was his paternal grandfather. These three constituted all of his nearest relatives on his paternal grandfather's side and were great paternal aunts of the intestate.

He was also survived by three sisters and one brother of Co-ho-kee, who was his paternal grandmother. Those four constituted all of his nearest relatives on his paternal grandmother's side.

After his death and before the case was tried two of the sisters and the brother of the paternal grandmother and all of the sisters of the paternal grandfather died, but each left issue. The trial court held that on his death, the paternal half of his allotment was inherited by the great uncle and the six great aunts in equal parts, and it was distributed to the surviving great aunt and to the issue of the deceased great uncles and the five deceased great aunts on this basis. From this decree the representatives of the three sisters of the paternal grandfather have brought the case here for review.

At the time the intestate died, the laws of descent and distribution of the state of Arkansas were in force in this jurisdiction. Both the father and mother of the deceased allottee were members, by blood, of the Seminole Tribe of Indians. This being true, we must consider the allotment as an ancestral estate and one-half of it as coming from his father and the other one-half as coming from his mother. Schulthis v. McDougal, 170 Fed. 529; Palmer v. King, 75 Okla. 276, 183 Pac. 411. On the death of the intestate one-half of his allotment was inherited by his heirs who were of the blood of his father and the other one-half thereof by his heirs who were of the blood of his mother. The maternal one-half of the allotment is not involved herein, because the litigation as to it has been settled, and unless otherwise stated, when we refer herein to the allotment or estate, reference is made to the paternal half.

It is, contended that the paternal half interest, on the death of the intestate, did not go to his heirs, but ascended to the heirs of Samsochee, who was his father. On the death of the intestate, who's heirs inherited the estate? The determination of this question largely determines the question of heirship involved herein. Were the heirs of the intestate or were the heirs of the intestate's father called to the inheritance?

In reference to this question some confusion has arisen in some of the decisions of this court. The confusion probably arose because of the language used in section 2531 of Mansfield's Digest of the Laws of Arkansas, which provides:

"Where the intestate shall die without descendants, if the estate came by the father, then it shall ascend to the father and his heirs; if by the mother the estate or so much thereof as came by the mother shall ascend to the mother and her heirs."

It is the estate of the intestate that is being administered. It is his heirs who are called to the inheritance and not the heirs of his father, who was the ancestor from whom the estate came.

This is the construction that has been placed on the statute by the Supreme Court of Arkansas. There have been numerous decisions construing the statute, but we shall only call attention to a late and an early case. By reference to the case of Scull v. Vaugine, 15 Ark. 695, it will be seen that Stephen Vaugine died in 1831 leaving his widow, Matilda, and his son, Joseph, an infant. Joseph died in 1846 and without issue and possessed of the estate

which he inherited from his father. The court awarded the personal property to the mother, but as to the real estate it said:

"But the real estate, having been inherited by Joseph from his deceased father, Stephen, was in his hands an ancestral estate, ex parte paterna, according to the doctrines settled in the case cited (Kelley's Heirs v. McGuire), and upon his (Joseph's) death without issue, passed by inheritance to his next of kin of the blood of his father. * * *"

In the case of Carter v. Carter, 129 Ark. 573, 195 S. W. 1185, the court said:

"In short, according to the rule in Kelly v. McGuire and West v. Williams, if the estate is ancestral, and come to the intestate by gift, devise, or descent on the part of the father or mother, it passes to the heirs of the intestate who are of the blood of the ancestor from whom it came."

These cases do not hold that on the death of the intestate the land ascended to the heirs of the ancestor from whom it came, but they do hold that it is inherited by the heirs of the intestate who are of the blood of the ancestor from whom it came. This we think is a correct interpretation of the statute, and we so held in the case of Lincoln v. Herndon, 141 Okla. 212, 285 Pac. 120.

We therefore hold that on the death of Ida, half of his allotment went to his heirs who were of the blood of his father and the other half went to his heirs who were of the blood of his mother.

It then becomes necessary for us to determine who were the heirs of the intestate who were of the blood of his father. He was survived by three sisters and one brother of his paternal grandmother and three sisters of his paternal grandfather. They were the nearest relatives who survived him and were all related to him in the same degree and were all of the blood of his father and were his heirs unless the surviving brother and the three sisters of his paternal grandmother are excluded from the inheritance under the claim made by the cross-petitioners in error. Their contention is that the estate ascended to the heirs of Samsochee, who was the father of the decedent, and that the three sisters of Muttee, who was Samsochee's father, inherited the estate to the exclusion of the surviving brother and sisters of the paternal grandmother. In support of their contention they say that section 2532 of chapter 49 of Mansfield's Digest is applicable. It is as follows:

"The estate of an intestate, in default of a father and mother, shall go, first, to the brothers and sisters, and their descendants, of the father; next to the brothers and sisters, and their descendants, of the mother. This provision applies only where there are no kindred, either lineal or collateral, who stand in a nearer relation."

Had this statute been applicable, the estate would have been divided, not between the seven uncles and aunts of Samsochee, but between the three aunts of Samsochee, who were the surviving sisters of Muttee, Samsochee's father. We have already held that it was not the heirs of Samsochee who were called to the inheritance. Those who were called were heirs of the intestate who were of the blood of Samsochee. Before section 2532, supra, could be applicable the father and the mother of the intestate must have been dead and the father must have left a surviving brother or sister or a descendant of one or the other. It is true that the father and mother of the intestate predeceased him, but his father did not leave surviving brothers or sisters or their descendants. The statute is therefore inapplicable.

All that section 2531, supra, did was to limit the heirs of the intestate to those who were of the blood of the father. This having been done, this statute spent its force. The order in which the heirs succeed and the proportion they take are to be determined, not by section 2531, but by the general table of descent. A portion of that table is section 2522 and is as follows:

"When any person shall die, having title to any real estate of inheritance, or personal estate not disposed of, nor otherwise limited by marriage settlement, and shall be intestate as to such estate, it shall descend and be distributed, in parcenary, to his kindred, male and female, subject to the payment of his debts and the widow's dower, in the following manner:

"First. To children, or their descendants, in equal parts.

"Second. If there be no children, then to the father, then to the mother; if no mother, then to the brothers and sisters, or their descendants, in equal parts.

"Third. If there be no children, nor their descendants, father, mother, brothers or sisters, nor their descendants, then to the grandfather, grandmother, uncles and aunts and their descendants, in equal parts, and so on in other cases, without end, passing to the nearest lineal ancestor, and their children and their descendants, in equal parts."

Section 2532, supra, is also a portion of the general table of descent, but it is inapplicable, because the facts in this case do not bring it within the terms of that section. That section not being applicable and the intestate having left no children

or their descendants, no father, no mother, no brothers or sisters or their descendants, subdivision 3, supra, must be the applicable section of the general table of descent, and from it it is clear that the paternal one-half of the allotment went to the great uncle and the six great aunts of the intestate in equal parts and to the issue of those who have since died, by right of representation.

The cross-petitioners Winey Harjo, Robert Hully, and Alex Harjo were each awarded an undivided one-twenty-eighth interest in the lands in controversy and Dick Palmer was awarded an undivided one-fifty-sixth interest therein. These four cross-petitioners urge that the oil and gas lease on the premises was invalid under the well-settled principles of law, including fraud upon the county judge, fraud upon the Indian, failure of consideration, and illegal methods of obtaining the guardian's lease. They say the Dick Palmer lease was clearly void, because all of the proceedings for the sale thereof, including the auctioning off of the lease, were conducted by the attorney for the buyer, who was ostensibly acting for the minor and who did not disclose either to the county judge or guardian that he was an attorney and acting in the interest of the buyer.

With respect to the leases attacked by the cross-petitioners, the court entered its judgment against them and in favor of the lessee and in doing so made a portion of its finding as follows:

"The court therefore finds that the lease made by guardian of Dickey Palmer under date of July 31, 1925, to be a valid and subsisting leasehold estate as provided in said lease in the defendant the Indian Territory Illuminating Oil Company and that it is free from fraud as a matter of fact or as a matter of law.

"The court further finds that the lease made by Alex Harjo on the 17th day of July, 1925, which leasehold estate now rests in the defendant Indian Territory Illuminating Oil Company, rests the leasehold estate in this defendant, and that there was no fraud, deceit, coercion of force used in obtaining this lease and it is free from fraud, and had this case been tried on the 19th day of July, 1925, the court is of the opinion that Alex Harjo would not have contended anything else.

"The court further finds that the lease made from Winey Harjo and Robert Hully on the 17th day of July, 1925, which leasehold estate, according to the records, is now vested in the defendant Indian Territory Illuminating Oil Company, was made free and voluntarily; that there was no fraud, as a matter of fact, by implication, or in law, when this lease was obtained and that at the time these leases were signed the lessors understood their rights, and that there was not a single solitary false utterance made in procuring the leases."

A careful reading of the record will disclose that there is an abundance of evidence to support the findings of the court, and it is a well-settled rule in this jurisdiction that in an equitable proceeding the judgment of the trial court will not be disturbed unless it is against the clear weight of the evidence. The judgment of the trial court is affirmed.

MASON, C. J., LESTER, V. C. J., and HUNT, CLARK, CULLISON, SWINDALL, and ANDREWS, JJ., concur.

RILEY, J., absent.

---

### On Rehearing.

ANDREWS, J. The cross-petitioners in error contend that important issues involved in the appeal, to wit, the validity of three oil and gas mining leases, were not determined by the opinion in this case in compliance with the constitutional requirement, in that the issues submitted by the cross-petitioners in error were neither discussed nor determined in the opinion, and that the opinion of September 9, 1930, refers to the contentions of the cross-petitioners in error only as follows:

"A careful reading of the record will disclose that there is an abundance of evidence to support the findings of the court and it is a well-settled rule in this jurisdiction that in an equitable proceeding the judgment of the trial court will not be disturbed unless it is against the clear weight of the evidence. The judgment of trial court is affirmed."

The cross-petitioners in error in their second petition for rehearing submit the following:

"If any one of the following contentions of plaintiffs in error be sound as a matter of law, the leases should be canceled.

"1. They are voidable because there was a relation of trust and confidence between the makers and John Willmott and the makers had no disinterested advice.

"2. A partial consideration at least for the execution of the leases was the agreement of John Willmott to bring suit for the Indians. This was not done. There was a partial failure of consideration.

"3. At the time he made the agreement, John Willmott did not intend to bring the suit. If he did not intend to bring the suit, he obtained the lease by fraud, for fraud includes making a promise without intent to perform. Sections 4996 and 4997, C. O. S. 1921; Haggerty v. Key. 100 Okla. 238 at 241,

229 Pac. 548; Wilson v. Rentie, 124 Okla. 37, 254 Pac. 64."

—and says:

"Plaintiffs in error are entitled to have the court say whether the leases should be canceled because of any one of the three grounds above stated."

Before this court should consider the questions of law as stated in the contentions quoted, it is necessary that those contentions as to the law be based upon facts shown by the record.

The trial court sitting in equity heard the oral testimony of the witnesses, observed their intelligence, capacity, manner, characteristics, and their fairness or bias. That court had the opportunity to judge the value of the testimony and did judge it, and found therefrom that the leases were freely and voluntarily made, that there was no fraud in fact or by implication, that the lessors understood their rights and that there was a fair and adequate consideration for the leases.

The preponderance of the evidence, as shown by the record, is against the facts necessary to support the contentions of law as submitted by the cross-petitioners in error. As we said in the opinion of September 9, 1930, the judgment of the trial court in an equitable proceeding will not be disturbed unless it is against the clear weight of the evidence. The judgment of the trial court in this case is not against the clear weight of the evidence.

We do not consider it necessary to discuss what the effect of the contentions made would be, had they been supported by the evidence in the case. Suffice it to say that they were not supported by a preponderance of the evidence in the case, and, after a careful review of the record, the second petition for rehearing is denied.

CLARK, V. C. J., and CULLISON, SWINDALL, McNEILL, and KORNEGAY, JJ., concur. LESTER, C. J., and RILEY, J., concur in conclusion. HEFNER, J., not participating.