## *CANFIELD et al. v. JACK et al.

No. 8793—Opinion Filed Feb. 10, 1920.

Application to File Second Petition for Rehearing Denied April 9, 1920.

(Syllabus by the Court.)

### 1. Equity—Maxims—"Clean Hands."

The maxim that one who comes into Equity must come with clean hands is based on conscience and good faith. The maxim is confined to misconduct in regard to, or at all events in connection with, the matter in litigation, so that it in some way affects the equitable relations subsisting between the two parties and arising out of the same transaction. "Clean hands" means a clean record with respect to the transaction with defendant, and not with respect to any third person.

### 2. Same—Validity of Deeds to Indian Land.

In the instant case the record is examined, and it is held that the finding and judgment of the trial court that C. did not come into court with unclean hands will not be disturbed.

### 3. Indians—Exclusive Powers of Congress—Champertous Conveyances.

Congress has exclusive power to authorize, regulate, and control the alienation of lands allotted to or inherited by members of the

*Appealed to the Supreme Court of the United States.

Five Civilized Tribes of Indians, and the law on champerty as set forth in section 2260 of the Revised Laws of Oklahoma, 1910 had no application thereto.

**4. Indians—Restricted Lands—Deed of Full-Blood Heirs—Approval.**

In the instant case the lands involved were restricted, and the deed of the full-blood heirs required the approval of the county court in order to be valid as provided in section 9 of an act of Congress approved May 27, 1908, (35 Stat. at L. 312, ch. 199).

**5. "Doctrine of Relation."**

The doctrine of relation is that principle by which an act done at one time is considered by a fiction of law to have been done at some other time.

**6. Indians—Deeds — Delay in Approval—Intervening Rights—Doctrine of Relation.**

. In the instant case, Cacy takes a deed from two full-blood Indian heirs, places it of record, and continues in possession for more than a year before securing the approval of his deed by the county court. In the meantime, however, Cornelius takes a deed from the same parties to the same land and has the same approved by the county court. The record does not show that Cacy had ever intended to have his deed approved prior to the execution and approval of the Cornelius deed. He contended that as a matter of law his deed did not require the approval of the county court. Held, that the doctrine of relation is not applicable to the facts of this case wherein Cacy contends that the approval of his deed relates back to its execution and first delivery, thus cutting off the intervening interest of Cornelius to the lands involved.

**7. Fraud—Pleading and Proof.**

Fraud, if relied upon, must be pleaded and proved.

Error from District Court, Creek County; Ernest B. Hughes, Judge.

Action between G. W. Canfield and others and Lolly Jack, by his guardian, John Tiger, and others, involving title to Indian allotment of Susie Crow, deceased. From the judgment, the parties first mentioned bring error. Affirmed.

McGuire & Devereux, Albert A. Thayer, and Chas. W. Grimes, for plaintiffs in error.

Joseph C. Stone, Chas. A. Moon, Francis Stewart, Geo. S. Ramsey, Malcolm E. Rosser, Villard Martin, J. Berry King, and Edgar A. de Meules, for defendants in error.

Edward H. Chandler and Wm. O. Beall, amici curiae.

Chas. A. Dickson, amicus curiae.

HIGGINS, J. The land involved in this litigation is in the heart of the Cushing oil field and is of great value. There were originally many parties and many conflicting interests, but owing to the fact that many of these interests have been settled, we will only burden the reader of this opinion with the facts necessary to determine the issues in this case.

In the month of September, 1899, Susie Crow, an infant, died, and after her death there was allotted to her heirs the lands, consisting of 160 acres, involved in this suit. On her mother's side there were two full-blood aunts, Mollie Crow, now Mollie Tiger, and Baby Barnett, now Baby Cumsey. They were the owners of one-sixth each of her allotment. On January 13, 1914, these two aunts joined in the execution of a deed to John Z. Cacy for their interest in the above lands, which was placed of record in the office of the county clerk January 20th following, and was approved by the county court as to 120 acres on March 3, 1915, and on February 14, 1916, was approved as to the whole 160 acres. On October 28, 1914, these two heirs joined in the execution of a deed to their interest in the above lands to Ira E. Cornelius, which was approved by the county court November 21, 1914. It is thus to be seen that the Cacy deed, which was the first in execution, was the last in approval, and that the Cornelius deed, which was the second in execution, was the first in approval. It is out of the conflicting claim of Cacy and his grantees and the claim of Cornelius, each claiming under his deed, that this cause arose.

In the pleading Cornelius claims title under his deed aforesaid, and Cacy and grantees in answer thereto plead as follows:

"And these defendants answering the cross-petition of Ira Cornelius say that they deny that said Ira Cornelius has or ever had any right, title, or interest in and to said land; that the pretended deeds taken by said Ira Cornelius were later in date than the deeds taken for the same land from the same grantors by these defendants, and that at the time of taking said deeds the title to said land had been conveyed by the grantors of said Ira Cornelius to these defendants and that these defendants were, and had been for more than one year prior to the execution of said deeds, in the open, notorious, and peaceable possession of said land, paying taxes thereon, and receiving the rents and profits therefrom, and that the grantors of said Ira Cornelius had not been in possession of said land, nor had they received the rents and profits for more than one year prior to the execution of said deed; that, in addition, the said Ira Cornelius took said deeds with full notice and knowledge of the possession and title of these defendants, and knew at the time he took said deeds that his grantors had

conveyed any interest they might have in said lands to these defendants, and that said Cornelius represented to the county court of Creek county, in order to get said deeds approved for the very small consideration paid to his grantors, that their rights were very uncertain and doubtful; and these defendants say that under these facts the said Ira Cornelius does not come into court of equity with clean hands, but that he purchased a speculative title, knowing the rights of these defendants, and paying a very insignificant price therefor, for the express reason that the rights of his grantors were doubtful and in litigation; a copy of the deed to said Ira Cornelius is hereto attached, marked 'Exhibit J,' and made a part hereof.

"And further answering the cross-petition of the defendant, Ira Cornelius, these defendants say: That heretofore, to wit, on the ___ day of _____, 19___, and prior to the execution of the pretended deeds by Mollie Tiger and Baby Barnett, instituted an action in the district court of Creek county, which said court then and there had jurisdiction in the premises herein, wherein the said Mollie Tiger and Baby Barnett were plaintiffs and George W. Canfield et al. were defendants, being known as Cause No. 3142, on the docket of said court, by which action the said plaintiffs claimed title and the right of possession in and to the land in controversy in this action; that such proceedings were had in said action, that the same was dismissed with prejudice to the rights of the said plaintiffs therein, and said judgment has become final; that said defendant, Ira Cornelius, purchased said land pending said action and with full knowledge thereof; and these defendants plead the judgment in said action as an estoppel of record against the said plaintiffs therein, and the said defendant, who purchased the said land with full knowledge of the pendency of said action."

The trial court found in favor of the Cornelius deed, and Cacy and his grantees seek a reversal in this court.

We shall classify the principal errors assigned for a reversal of this case as follows: First, that the court erred in failing to find that Cornelius came into court with hands unclean and that his deed was champertous; second, in finding that the rules of this court promulgated August 15, 1914, in regard to the approval of a full-blood deed, had not been violated; third, in holding that the lands involved were restricted and that the deed to him, Cacy, must be approved; and, fourth, in holding that the title in his, Cacy's, deed did not relate back to its execution and first delivery, thus cutting off Cornelius' rights acquired subsequent to the execution thereof.

Under the first assignment of error, that Cornelius did not come into court with clean hands, the record shows that Cornelius knew

of the Cacy deed at the time he procured his, Cornelius', deed; that Cacy prior to his deed herein had procured a deed from another heir, and under that deed made improvements and was in possession of the land when the deed in question was executed to him.

In American Ass'n v. Innis, 109 Ky. 595, 60 S. W. 388, it is stated:

"The maxim that one who comes into Equity must come with 'clean hands' is based on conscience and good faith. The maxim is confined to misconduct in regard to, or at all events in connection with, the matter in litigation, so that it in some measure affects the equitable relations subsisting between the two parties and rising out of the same transaction. 'Clean hands' means a clean record with respect to the transaction with defendant, and not with respect to any third person."

We do not believe the evidence is sufficient to prove that Cornelius came into court with hands not clean. The question of the purchase of a speculative title and the inadequacy of consideration charged under this assignment will be discussed in another part of this opinion.

Champerty is not available as a defense to a deed executed by a full-blood Indian. In Murrow Indian Orphan Home v. McClendon, 64 Oklahoma, 166 Pac. 1101, this Court held:

"Our statute on champerty does not apply to restricted Indian lands. Congress has reserved the exclusive right to control the sales and prescribe the conditions, under which title to these lands may pass. And a conveyance of such lands, made in compliance with the acts of Congress and the rules and regulations of the Department of the Interior, carries title to such lands as against the world."

In the second assignment of error Cacy contends that the trial court erred in not finding that the rules of the Supreme Court promulgated August 15, 1914, in reference to the approval of a full-blood Indian's deed, had not been violated. The pleading, as will be seen, does not set this forth as a defense, so we will examine the record to ascertain if there is any evidence of this fact.

In the trial of the case Cornelius sought to get an admission from the opposing parties that at the time his deed was approved he called the county court's attention to the fact that his Indian grantors had executed a former deed to Cacy and that the parties objecting to his deed appeared in the interest of those who had the prior deed. Cacy and his grantees refused to so admit, whereupon Cornelius was placed upon the stand to prove this contention, and in his testimony there was developed the fact that there was a

record made in the county court as to these facts at the time the deed was approved. Whereupon Cacy and his grantees objected to oral testimony for the reason there was a record of what was done, which objection was by the court sustained. The record then was offered by Cornelius, but objections were further made thereto upon the ground that the record was not competent for any purpose whatsoever. The record was introduced in evidence, and it is into this record we are now asked to look and ascertain if the rules of this court have been violated, as well as to consider other irregularities alleged by Cacy to have taken place therein.

We find that this record was introduced in the trial court for the purpose of showing that Cornelius called the attention of the county court to the Cacy deed, prior to the approval of his deed, and that there were certain parties objecting to its approval who appeared in the interest of those who held under the Cacy deed, and this record should not be considered for the purpose of showing whether or not the rules of this court had been violated or for any other purpose other than the purpose for which it was introduced. If Cacy and his grantees believed the rules of this court had been violated or that there were grave irregularities and wished to rely thereon to defeat the Cornelius deed, they should have pleaded and proved such at the trial, and opportunity should have been given the other side to controvert the same. From the record we find that the attention of the county court at the time it approved the Cornelius deed was called by Cornelius to the former deed executed by these two Indian women to Cacy, and that Cacy and some of his grantees, but not all, appeared in the county court at that time.

Under the third assignment of error Cacy and his grantees contend that the lands involved were not restricted and that the deed in question did not require approval. This was Cacy's and his grantees' contention at the time the pleadings were joined, the trial was had in the lower court, and the first brief filed in this court. This seems to have been their principal defense, and it is strenuously urged in their brief first filed. The question there is exhaustively discussed. Since the filing of the first brief, the Supreme Court of the United States, in Tally v. Burgess, 246 U. S. 104, 63 L. Ed. 600, has held that the lands were restricted and the deed of a full-blood heir must be approved. Consequently this defense is not now available to Cacy and his grantees.

In view of the fact that Cacy and his grantees have heretofore contended so strenuously that the lands herein involved were free of restrictions and the deed of his full-blood grantors required no approval, it might be well herein to give the history of judicial expression pertaining thereto and ascertain if Cacy and his grantees have been misled to their prejudice by judicial expression or by their own construction of statutory law pertaining thereto. ,

The Supreme Court of the United States, in Mullen v. United States, 224 U. S. 448, Sheldon v. Dill 235 U. S. 206, Atkins v. Arnold, 235 U. S. 417, and in Greenlee v. Morris, 239 U. S. 627, wherein inherited lands were conveyed and rights acquired prior to the act of Congress of April 26, 1906 (34 Stat. 137), held that there were no restrictions on inherited lands of the members of these tribes and that an heir might sell the same. Congress, in order to give protection to the full-blood members of these tribes, provided in section 22 of the act of April 26, 1906, that all conveyances of inherited lands made by full-blood Indians are subject to the approval of the Secretary of the Interior. In this act for the first time Congress has placed the Indian into two classes, that is, the full-blood Indian and the mixed-blood Indian. Again, under section 9 of the act of May 27, 1908, Congress provided that the conveyance of full-blood Indians shall be approved by the court having jurisdiction of the settlement of the estate of the deceased. Cacy's deed was executed to him January 13, 1914, subsequent to both of the acts mentioned above, wherein an approval of such a deed was required. We know of no judicial expression of an appellate court holding that the lands herein involved were not restricted and the deed did not require approval at the time of its execution. This cause came on for trial in the trial court June 27, 1916, but previously thereto this court, on February 15, 1916, in Sampson v. Staples, 55 Okla. 547, 155 Pac. 213, held that the deed of a full-blood heir must be approved. On June 17, 1916, the United States district court for the Eastern district of Oklahoma, in Younken v. David, 235 Fed. 621, held to the contrary. This issue finally reached the Supreme Court of the United States, and in Tally v. Burgess, supra, it was held, as in this court, that the deed must be approved. Consequently it is to be seen that Cacy in failing to secure the approval of his deed was not prejudiced at the time it was executed by any appellate court holding that it did not have to be approved. If he was prejudiced in any way, it was for the reason that he erroneously construed federal statutes. At the time he took his deed there was the act of April 26, 1906, and of May 27, 1908, both requiring its ap-

proval, and he went into the facts of both of these acts.

Under the fourth assignment of error Cacy and his grantees contend that the trial court erred in not holding that the approval of Cacy's deed on March 3, 1915, related back and that the title to him became effective upon the date of its execution and first delivery to him, to wit, January 13, 1914. This is invoking the doctrine of relation. 34 Cyc. 1036, states:

"That the doctrine of relation is that principle by which an act done at one time is considered by a fiction of law to have been done at some antecedent time."

Devlin on Real Estate, at section 328, says:

"The general rule is that the title passes only upon the second delivery, or upon the happening of the event made the condition of delivery. But in certain cases, for the prevention of injustice, the instrument will relate back to the first delivery so as to pass title at that time. The law upon this point has been thus stated: 'The title only passes on the performance of the condition or the happening of the event, except in certain cases where by fiction of law the writing is allowed to take effect from the first delivery. This relation back to the first delivery is permitted, however, only in cases of necessity and where no injustice will be done, to avoid injury to the operation of the deed from events happening between the first and second delivery; as if the grantor, being a feme sole, should marry, or, whether a feme sole or not, should die or be attained after the first and before the second delivery, the deed will be considered as taking effect from the first delivery, in order to accomplish the intent of the grantor, which would otherwise be defeated by the intervening incapacity. But subject only to this fiction of relation in cases like those above supposed and others of the kind, and which is only allowed to prevail in furtherance of justice and where no injury will arise to the rights of third persons, the instrument has no effect as a deed, and no title passes until the second delivery; and it has accordingly been held, that if, in the meantime, the estate should be levied upon by a creditor of the grantor, he would hold by virtue of such levy in preference to the grantee in the deed.' "

In support of this doctrine the following cases, some of which are Indian cases, are urged: Almeda Oil Co. v. Kelly, 35 Okla. 525, 130 Pac. 931; Scioto Oil Co. v. O'Hern, 67 Oklahoma, 169 Pac. 483; Pickering v. Lomax, 145 U. S. 310, 36 L. Ed. 716; Lomax v. Pickering, 173 U. S. 26, 42 L. Ed. 601; Lykins v. McGrath, 184 U. S. 169, 46 L. Ed. 485. In Pickering v. Lomax the cause was reversed upon the application of the doctrine of relation as applied to the facts of that case, but in Lomax v. Pickering the case did not turn on that doctrine. In the language of the latter opinion in the body of the same the following is said:

"By the approval of the first deed (which was the first approval) the title of Robinson was wholly divested and there was nothing left upon which a subsequent approval could operate unless we are to assume that such subsequent approval in some way revested the title in Robinson and passed it to McClure."

In Murray v. Wooden, 17 Wend. (N. Y.) 531, an Indian executed separate deeds to two parties. The law required that his deed be approved by a certain official. The deed first in execution was last in approval, just as in this case. The court held that the deed second in execution but first in approval prevailed over the deed first in execution but last in approval.

The other cases referred to as having been decided in this court were such as where an Indian had executed an oil and gas lease, requiring the approval of the Secretary of the Interior, and where the lessee had filed the same in that office for approval as by law required, but while the lease was pending and before its approval, the Indian died (Scioto Oil Co. v. O'Hern, supra). This court held that in such a case an approval by the Secretary of the Interior, even though after the death of the lessor, related back, under the doctrine of relation, to make title effective under the lease as of date of its first delivery to the lessee; that the equity of the lessee was superior to the equity of the heirs of the deceased grantor, and the filing of the application for the approval of the lease in the Interior Department was constructive notice to all subsequent purchasers from the heirs.

In this case, Cacy procured his deed, placed it of record, held possession, and for more than a year made no effort to procure its approval. Cacy had taken a deed and was in possession of land of full-blood Indian contrary to federal law. His deed was valid until approved by the county court. In none of the cases cited above is it held that the deed last in approval takes title to the land. In the Lomax v. Pickering case the deed first in approval passed title. We do not believe that under the doctrine of relation an approval of a full-blood Indian's deed will relate back to its execution and first delivery when the same is taken in violation of statute, and thus cut off a subsequent purchaser who has taken his deed and had it approved as by law required.

We do not believe that an unapproved deed of a full-blood Indian, whether appearing of record or not, is a cloud upon his title. We

do not believe that such an Indian, by his act or by the act of any one dealing with him, can execute any instrument of writing, other than in the way directed by statute, that will be a cloud upon his title or affect it in any way, and such a deed appearing of record is merely a stray deed taken in violation of law and is not notice to any one. When a full-blood Indian presents his deed for approval the law declares for him that his title is clear in so far as his acts theretofore are concerned. If the doctrine or relation could be applied to the facts of this case, then the beneficent power of the federal government to protect him from his improvidence would be very much weakened, and would be destructive of those safeguards placed about a helpless people by acts of Congress.

We therefore find that under the facts of this case the doctrine of relation is not applicable thereto.

In the briefs of Cacy and his grantees there is much said about the inadequacy of consideration paid these Indians by Cornelius. Cacy appears now to be under the belief that Cornelius wronged him by failing to pay the Indian women an adequate consideration. We believe the wrong, if any, was against the Indian women. Inadequacy of consideration is not pleaded as a defense against the Cornelius deed by Cacy and his grantees further than to attempt to show that Cornelius did not come into court with clean hands. We have examined the record and find there was a marked silence on that subject in the trial court. The Indian women were parties there, and if that issue had been raised there these women might have been shown beneficiaries of an inadequacy of consideration by either Cornelius or Cacy. But in this court these women did not appeal, and we cannot grant them any relief, consequently there is a greater freedom of action along that line.

Let us examine the record and ascertain how much was paid by Cornelius and by Cacy to these Indians. Cornelius had his deed approved on November 21, 1914, and paid them $1,000. Prior to that time he had paid them $125 for a lease. Cacy had his deed approved as to 120 acres on March 3, 1915, and the consideration shown therein was $600, and on February 14, 1916, had it approved for the whole 160 acres, there being paid the Indians $450 by one of his grantees with a promise to pay them a like sum out of the run of the oil. The total amount paid these Indians in cash by Cornelius was $1,125, and by Cacy and his grantees was $1,050. So if Cornelius sinned by paying an inadequate consideration to the Indians, then Cacy and his grantees have also sinned. If the consideration is insufficient, then for one of these parties to complain at the other "would be like the pot calling the kettle black."

But was this sum at the time it was paid by either Cornelius or Cacy inadequate under the facts and law applicable thereto when these deeds were executed and approved? At the time these deeds were taken by these parties and were approved, the Supreme Court of this state had on June 18, 1912, in Brady v. Sizemore, 33 Okla. 169, 124 Pac. 615, held that the paternal heirs took to the exclusion of the maternal heirs. This case finally reached the Supreme Court of the United States, 235 U. S. 441, and it was there held, that the paternal heirs took to the exclusion of the maternal heirs. These aunts were of the maternal line. Consequently, at the time these deeds were taken and approved, the two highest courts of the land had held that these Indian women had no title. Both Cacy and Cornelius, at the time they purchased this land and had their deeds approved, were merely buying shadows.

It is contended in the brief of Cacy and his grantees that, owing to the form of the Cornelius deed and the allegations set forth therein as to other instruments of writing affecting title to the lands involved, his deed was therefore subject to the Cacy deed. It is not clear, however, under what assignment of error this objection goes. In the Cornelius deed the many instruments of writings, suits, and other facts affecting title prior to his deed were set forth. The reference therein to the deed to John Z. Cacy is in words as follows:

"Whereas, Mollie Tiger and Baby Cumsey, nee Barnett, did on the 13th day of January, 1914, execute a quit-claim deed to John Z. Cacy for all of said land above described."

In this deed there are in all some 30 "whereases" set forth, going to show the various clouds on the title and contentions that the Indian women did not possess title to the lands involved. There is no reservation in the deed that the Cornelius deed was subject to the purported title of others, or words importing such. We do not believe that the language of the Cornelius deed is uncertain or ambiguous as to it being subject to the Cacy deed. This was not contended in the trial court and was not specifically referred to in the assignment of errors in this court. We believe the Cornelius deed is sufficiently clear to require no construction.

We therefore find that the Cornelius deed was not taken and approved subject to the deed to Cacy.

In the briefs of Cacy and his grantees much is said in regard to fraud being perpetrated by Cornelius on the Indian women. Fraud as a defense was not alleged in the pleadings, and was not relied upon in the trial of the case.

Lewis C. Lawson, Esq., as attorney for Mollie Tiger and Baby Cumsey, nee Barnett, has filed in this court a brief in their behalf which shows a great research of the law pertaining peculiarly to the protection afforded by federal law to full-blood members of the Five Civilized Tribes, and is a wealth of information on that subject. We have carefully examined this brief. The matters we are urged therein to determine we cannot do, for the reason that his clients, who were parties in the lower court, did not except to the judgment therein rendered, did not appeal to this court, and have not filed any cross-petition in error.

As the record does not disclose when Clara A. Ryan acquired her title to a portion of the lands, we are unable to say whether or not she is an innocent purchaser, and for that reason refuse to disturb the decree in her favor, for whatever interest she may have.

Pending the appeal various settlements have been made affecting the rights of some of the parties to the proceedings in error. These settlements, as between the parties thereto, will, so far as possible, remain unaffected by this opinion.

As to the question of ad valorem taxes on the funds in the receiver's hands, the trial court is directed to determine all issues involving liability of the funds to taxation of which it may have jurisdiction whenever that question may properly be triable.

Affirmed.

RAINEY, V. C. J., and KANE, JOHNSON, and BAILEY, JJ., concur; PITCHFORD and McNEILL, JJ., dissent; OWEN, C. J., disqualified; HARRISON, J., not participating.

——————

Dissenting Opinion Filed March 16, 1920.

McNEILL, J. (dissenting). I am unable to agree with the majority of the court either upon the conclusions as stated in the opinion, or the law cited as being applicable to the facts in the case at bar.

The case as presented in this court involves only the title and rights of Ira E. Cornelius on his cross-petition against his codefendants, Geo. W. Canfield et al. A brief history of the titles asserted, on the one hand by Cornelius, and on the other by Canfield, Lancaster, Grimes, the Cacys, Canterbury, Waller and Pettet, discloses the following state of facts: Susie Crow, granddaughter of Ho-Ko-Let-Chee and Ah-La-Co-Hon-ney, by some known as Orla or Fannie Fulsom, and by others as Fannie Crow, having died in September, 1899, there was selected and set apart in her name and right an allotment consisting of the south half (S½) of the southwest quarter (SW¼) and the west half (W½) of the southeast quarter (SE¼) of section four (4), township eighteen (18) north, range seven (7) east, containing 160 acres more or less, patents to which issued on the 14th day of May, 1906. On February 10, 1911, Orla Fulsom, the grandmother, claiming to be her sole surviving heir, filed in the county court of Creek county a petition for the approval of a deed made by her to J. H. Cacy to the lands allotted in the name and right of Susie Crow, deceased. Thereupon an order was made appointing C. A. Peterson, F. S. Lozier and John Tiger appraisers, who on the same day returned into the county court their written appraisement fixing the value of the land at $900. On the 30th day of June, the petition coming on to be heard, the court found that the grandmother was the sole and only heir at law of Susie Crow, deceased; that the consideration of $1,000 provided for in the deed was "adequate"; and entered an order approving the deed executed to J. H. Cacy. Both at the time of purchasing and of appraisal it appears that Orla Fulsom was the only heir asserting title as an heir in the estate of Susie Crow. J. H. Cacy took possession of the lands, and on the 25th day of March, 1912, sold the same to his brother, John Z. Cacy for a consideration of $1,200. On the same day John Z. Cacy and wife conveyed the southwest quarter (SW¼) of the southwest quarter (SW¼) thereof to Geo. W. Canfield for a consideration, shown in the deed, of $500. On the 12th day of August, 1912, John Z. Cacy and wife sold to Thomas Mogan the southeast quarter (SE¼) of the southwest quarter (SW¼) for a consideration, recited in the deed, of $700 and which tract of land Mogan sold to J. S. Cosden May 3, 1915, for a consideration of $13,000. On the 20th day of April, 1914, John Z. Cacy and wife conveyed a one-half interest in the south half (S½) of the southwest quarter (SW¼) of the southeast quarter (SE¼) to Geo. W. Canfield for a consideration, as shown in the deed, of $600. On the 20th day of May, 1914, John Z. Cacy and wife sold to Waller and Pettet an undivided one-fourth interest to the south half

(S½) of the southwest quarter (SW¼) of the southeast quarter (SE¼) for a consideration named in the deed of $500. On the 26th day of October following, Cacy and wife conveyed to Chas. W. Grimes and O. M. Lancaster their title to the northwest quarter (NW¼) of the southeast quarter (SE¼) and the north half (N½) of the southwest quarter (SW¼) of the southeast quarter (SE¼) for a consideration of $7,000 paid them, as shown by the deed. Afterwards, on different dates, various alleged collateral heirs, including Willie Harry, Lydia Cates, Johnnie Jack, Shawnee Harry, Ella Harry Jackson, Eddie Jack. Micey Harry, Jennetta Willie, Edmond Harry, and Netsh Harry, as well as Lusanna Daniels, nee Brink, and Katie Painkiller, executed deeds of conveyance, either to the Cacys or their grantees, to the interest claimed by them in the lands in controversy or a portion thereof. The validity of these later deeds or the rights acquired thereunder, if any, not being involved in the case under consideration, is not determined.

It is now settled that the grantors to both deeds, being full-blood Creek Indians, and their respective deeds of conveyance having been executed subsequent to May 27; 1908, were, in respect to restrictions and approval, subject to the act of Congress of that date (Chapter 199, 35 Stat. at L. 312.) The allotment was made in the name of Susie Crow after her death, and consequently in her right as an enrolled Creek citizen, and while it gave to the heirs the power to sell and convey their interest in the lands allotted in her name, none the less it required approval by the court having jurisdiction of the settlement of her estate, which it is agreed was the county court of Creek county. Both deeds being executed and approved in compliance with the act of Congress of May 27, 1908 (Chapter 199, 35 Stat. at L. 312), it is for us to determine the rights of the parties under those conveyances.

The claim of title of Mollie Tiger and Babie Barnett, aunts of Susie Crow, deceased, to an interest in said land was first asserted in 1913, by instituting proceedings in the district court of Creek county to recover an interest in said land. John Z. Cacy and the grantees of John Z. Cacy were made parties in said action. On the 6th day of September, 1913, Cornelius was made a party to said action. Cornelius at that time was claiming an interest by virtue of an oil and gas lease executed to him by Mollie Tiger and Babie Barnett on said premises. On January 13, 1914, Mollie Tiger and Babie Barnett executed a quitclaim deed to John Z. Cacy, which deed was approved March

3, 1915, as to the west half (W½) of the southeast quarter (SE¼) and the southwest quarter (SW¼) of the southwest quarter (SW¼), and by a further order of court made on February 8, 1916, the deed was approved in its entirety. On January 21, 1914, the case was dismissed by Babie Barnett and Mollie Tiger with prejudice. A few days thereafter a motion was filed to set aside said order of dismissal, which was denied. Thereafter an additional motion was made to set aside said order, which was denied, and the case was brought to this court, and was later compromised and dismissed. All or practically all of the interest of John Z. Cacy had been disposed of by him, and the title of Canfield et al. as to the interest of Mollie Tiger and Babie Barnett depends upon the deed executed by Mollie Tiger and Babie Barnett to John Z. Cacy on January 13, 1914.

Ira E. Cornelius claims by virtue of a deed executed by Mollie Tiger and Babie Barnett October 28, 1914, and approved November 21, 1914. This deed, it will be noticed, was subsequent in point of time to the deed of the common grantors to John Z. Cacy, dated January 13, 1914, but was approved prior to either of the orders of approval of the Cacy deed. It must be remembered that this cause of action was tried in the lower court and is to be determined on appeal in this court upon the cross-petition of Cornelius against Canfield et al. as defendants. Cornelius claimed that Mollie Tiger and Babie Barnett were the owners of said land and that he had purchased from them, and asked to be decreed a two-thirds interest in the estate. Canfield, Grimes, Lancaster et al. answered, setting out the deed that Mollie Tiger and Babie Barnett had executed to John Z. Cacy, which deed had been approved by the county court, then set out the deed of Cornelius, and alleged that the deed of Cornelius specially referred to the fact that the said Mollie Tiger and Babie Barnett had, prior to the time of executing a deed to Cornelius, executed a deed to Cacy, and further pleaded that Cornelius did not come into court with clean hands, and that Cornelius purchased his title subject to all of the equities and rights of Cacy and his grantees.

During the trial of the case in the district court there was introduced in evidence the proceedings had in the county court at the time Cornelius had his deed approved. This proceeding contains some 30 or 40 pages, and it is upon this record that Canfield et al. rely to substantiate the allegations in their answer that Cornelius did not come into court with clean hands, and as now contended, that he violated rule 10 of this court in having his

deed approved. The opinion of the majority of the court states that this record was introduced for a certain purpose and could not be considered to determine whether or not the rule of this court had been violated in the approval of the Cornelius deed, and whether Cornelius came into court with clean hands. By applying the law to the facts as they appear from the record, I cannot agree with this portion of the opinion.

I think the rule is well settled that where evidence has been introduced, it is to be considered for all purposes, unless at the time the evidence is received the party offers it and specially states that it is introduced or tendered for a limited purpose, and if no statement is made or no agreement made that it shall be introduced for a special purpose, then it is in the record for all purposes material to the issues in the case. Counsel for Cornelius cite and rely upon numerous cases to support their contention. A similar case was decided by the Supreme Court of California, being Sears v. Starbird, 20 Pac. 547, a case where a judgment roll of the court was under consideration, the court stating as follows:

"Where a judgment roll is offered as evidence, with no statement limiting its purpose, and upon objection the object of its introduction is stated, whereupon the objection is made that it is incompetent for any purpose, which is overruled, the record becomes evidence for all legitimate purposes, and is not limited to that mentioned by the party introducing it."

The court in the body of the opinion stated the rule as follows.

"In the absence of an express understanding between counsel and the court that evidence is to be limited to a particular matter, the court will be authorized to consider it for any purpose for which it is competent and relevant to the issues."

This case supports the rule that such evidence is introduced for all purposes, and I cannot believe the record in this case takes the case out of the general rule.

An examination of the record convinces me there was no request made that the evidence introduced should be received for a special or limited purpose, nor did counsel for plaintiffs in error ask that it be limited to a special purpose. The evidence was objected to for the reason it was not admissible for any purpose, and this objection was overruled, neither the court nor attorneys for Cornelius stating that the purpose for which it was introduced was limited in any way. The record relating to this question is as follows:

"By Mr. Stone: Probably I can get an admission on the point I want. I want to show by Cornelius, at a contest, the approval of the deed executed by Mollie Tiger and Babie Barnett, approved by the county court of Creek county, it was called to the attention of the court that these grantors theretofore had made another deed, and it was further called to the attention of the court that the parties objecting appeared in the interest of those who had the prior deed.

"By Mr. Grimes: It is not admitted.

"By the Court: It is not admitted?

"By Mr. Grimes: No, sir.

"Ira Cornelius, recalled as a witness, on the part of the defendant, Ira E. Cornelius, testified as follows, to-wit:

"Q. Mr. Cornelius, at the contest in the county court of Creek county on the hearing for the approval of your deed executed by Mollie Tiger and Babie Barnett, state whether or not the court's attention was called to the fact that these grantors had made a deed covering this same land, prior to that date?

"A. Yes, sir.

"Mr. Devereux: One minute, we object to that. However, I will ask a question first.

"Q. Was there a record taken down of the proceedings? A. I don't think there was a complete record made; a partial record.

"Q. There was a record made of the whole proceedings—I want to know? A. No, part of them.

"Mr. Devereux: I object to this; this may be of record.

"Mr. Stone: I have the record here; I didn't want to encumber this record with it, 30 or 40 pages.

"By the Court. The objection is good. I think the record is the best evidence.

"Mr. Stone: It is agreed by counsel that the copy which I now hand the court reporter is a copy of the proceedings had in the matter on the approval of the Cornelius deed.

"Mr. Devereux: We don't object to that on the ground it is a copy, but we don't admit it is admissible for any purpose.

"By the Court: Objection overruled.

"Mr. Devereux: Save our exception.

"Mr. Stone: We rest.

"By the Court: It may be that no testimony along that line will be material.

"Mr. Devereux: That is the point of it exactly.

"By the Court: But upon that I will hear argument."

In my judgment the record brings this case clearly within the rule announced in the case of Sears v. Starbird, supra, and the record of the county court must be considered

for all purposes that were at issue in the case.

The next question presented is, Did Cornelius come into the court with clean hands, and does the rule have any application to the case at bar? It must be remembered that this is a case in equity, where Cornelius is asking to be decreed the owner of the land in question, notwithstanding the fact that Cacy had a deed executed prior to his deed, although approved by the county court after the deed of Cornelius.

If we look to the record of the county court which was introduced by Cornelius, and as counsel for Cornelius now claim was introduced for a limited purpose, to wit, to call the attention of the county court to the fact that Mollie Tiger and Babie Barnett had executed a deed to Cacy, so upon their theory of the case we have a right to look to the record and see what they stated. The deed to Cornelius contained the following provision:

"Whereas Mollie Tiger and Babie Cumsey, nee Barnett, did on the 13th day of January, 1914, execute a quitclaim deed to John Z. Cacy for all of said lands above described."

The county court proceedings disclose that Mr. McDougal was representing Cornelius when having his deed approved, and in advising the county court concerning the deed executed by Mollie Tiger and Babie Barnett to Cacy, he stated as follows:

"Mr. McDougal: And if these parties sold to John Z. Cacy I don't see that that's any reason for the standpoint of the full-blood heirs themselves—if they have any interest left and want to sell it and got $1,000 for it. I don't think the probate attorney would object."

And he further stated as follows:

"Mr. McDougal: They are buying whatever interest these parties may have, if they have any. If they have any, and it's a very serious question in my mind whether they have any interest at all—if they have any, then the extent of it is not questioned. It does specify that it conveys all their interest, whatever that may be, but as to the extent of it, they don't know and nobody else knows. That's the question; they are satisfied to take the money that's offered to them for whatever contingent interest they may have."

In addition to these statements by Cornelius' attorney, Mr. Cornelius himself testified there was a large gas well offsetting said land to the north, and to the south an oil well producing 2,700 barrels per day, within a quarter of a mile of this land. He estimated the land worth between $18,000 and $20,000. Parties offered to show that the land was worth at least $100,000 at that time. As to

why Mr. Cornelius was getting the deed, he was asked the following questions by the probate attorney:

"Mr. Cornelius, your object in taking this deed, as I understand it, is to make an effort to get deeds from all of the adverse claimants to this property and get the matter in shape so that the property might be marketed, is it? A. Well, I can't say that it is, exactly; I would like to do that if 1 could. Q. Didn't you so state to me in my office some three or four weeks ago? A. Yes, sir. Q. Then that is partly your purpose, is it? A. Partly my purpose; yes, sir. Q. Have you received an offer for this land in the event you can get the title to it in such shape as to convey title to the purchaser? A. No, sir."

This, in my judgment, makes the facts in this case very similar to the facts in the case of Randolph v. Quidnick, 35 U. S. 457, where the court stated as follows:

"In other words, these complainants are asking the interposition of a court of equity to establish their title to property worth over half a million of dollars, obtained by purchase at execution sales for $275. The immense disproportion between the value and the cost, shocks the conscience of a chancellor and forbids the supporting action of a court of equity. Some rights must have suffered and some wrong must have been done by such a transaction, and a court of equity properly says that it will not lend its aid to further such an unconscionable speculation."

The Supreme Court of the United States, in the case of Miss. and Mo. R. R. Co. v. Cromwell, 91 U. S. 643, which was a bill in equity against the railroad company and Muscatine county to compel the former to transfer to the complainant on its books and to issue to him a certificate for 1,714 shares of its capital stock standing in the name of Muscatine county, which stock the complainants claimed to have purchased at an execution sale made by the marshal for the sum of $50, stated as follows:

"The parties to such a transaction ought at least to be left to their remedies at law. A court of equity should have no sympathy with any such contrivances to gain a contingent or speculative advantage, if any such is to be gained.

"On the other hand, if, as intimated by the counsel, there is a contingency of obtaining the sixteen per cent. appropriated to this stock by the arrangements made between the two railroad companies (now amounting to over $32,000), the case stands on no better grounds to recommend it to the special interposition of the court. This result cannot be attained without in some way depriving the county of Muscatine of that sum. If by payment of the county bonds, or in any other way the sixteen per cent. becomes liberated from the decree, the county will be

equitably entitled to the money, unless Cromwell, the appellee, has a better equity. To him it will be a windfall, like a price in a lottery. He paid no adequate consideration to entitle him to claim it as matter of equity. If the law gives it to him, he should seek his remedy at law. Equity will not lend its aid to any such games of hazard. The levy on the stock and the formal sale of it by Harrison, after having with other creditors obtained a decree for appropriating the sixteen per cent. due on it, was evidently not done for the honest purpose of making his debt by the sale, or he would not have allowed it to be sold for fifty dollars. The object must have been to get, by the forms of sale, some ulterior unconscionable advantage by the possession of the stock. The purchaser, Cromwell, stands in no better position. He comes into court with a very bad grace when he asks to use its extraordinary powers to put him in possession of thirty thousand dollars worth of stock for which he paid only fifty dollars. The court is not bound to shut its eyes to the evident character of the transaction. It will never lend its aid to carry out an unconscionable bargain, but will leave the party to his remedy at law."

It seems to me, the reasoning in the above entitled cases applies to the facts in the case at bar.

There is another reason why I do not believe the defendants in error can recover in this action. The defendants in error claim under a quitclaim deed. The effect of a quitclaim deed is well considered by Mr. Justice Field, in Moelle v. Sherwood, 148 U. S. 31, 37 Law Ed. 350, as follows:

"In the other case, that of quitclaim, the grantor affirms nothing as to the ownership and undertakes only a release of any claim to or interest in the premises which he may possess without asserting the ownership of either. If in either case the grantee takes the deed with notice of an outstanding conveyance of the premises from the grantor, or of the execution by him of obligations to make such conveyance of the premises, or to create a lien thereon, he takes the property subject to the operation of such outstanding conveyances and obligation and cannot claim protection against them as a bona fide purchaser. But in either case if the grantee takes the deed without notice of such outstanding conveyance or obligation respecting the property, or notice of facts, which, if followed up, would lead to a knowledge of such outstanding conveyance or equity, he is entitled to protection as a bona fide purchaser upon showing that the consideration stipulated has been paid, and that such consideration was a fair price for the claim or interest designated. * * * Whether the grantee is to be treated as taking a mere speculative chance in the property or a clear title must depend upon the character of the title of the grantor when he made the conveyance; and the opportunities afforded the grantee of ascertaining this

fact, and the diligence with which he has prosecuted them, besides the payment of a reasonable consideration, determine the bona fide nature of the transaction on his part."

We then have a quitclaim deed which refers to the fact that the grantors had prior thereto executed a quitclaim deed, and the statement from the plaintiff's attorney that they were only purchasing what interest the grantors had left, which recital in the deed and statements made are copied heretofore in this opinion.

The effect of the recital in the deed that the grantors had executed a quitclaim deed was binding on Cornelius, and he will not be permitted to deny the effect of that deed. Encyclopedia of the United States Supreme Court Reports, vol. 5, page 276, states as follows:

"A recital of one deed in another binds the parties and those who claim under them. Technically speaking, it operates as an estoppel, and binds parties and privies; privies in blood, privies in estate, and privies in law. But it does not bind mere strangers, or those who claim by title paramount the deed. It does not bind persons claiming by an adverse title, or persons claiming from the parties by title anterior to the date of the reciting deed."

The Supreme Court of the U. S. in the case of Crane v. Lessee of Morris, 6 Pet. 506, 8 L. Ed. 514, states as follows:

"The general rule of law is, that a recital of one deed in another, binds the parties and those who claim under them by matters subsequent. Technically speaking, such a recital operates as an estoppel, which works on the interest in the land, and binds parties and privies; privies in blood, privies in estate, and privies in law."

See, also, Carver v. Jackson, 7 L. Ed. 761, and cases annotated thereunder.

If there ever was, in my judgment, a case where the grantee should be bound by the recital in the deed, it applies to the facts in this case. Here the deed referred to the fact that this property had been sold to Cacy prior to the time Cornelius had purchased. It was represented to the county court, if the heirs had anything left, and wanted to sell it, there should be no objections to the full-blood heirs selling what they had left; thereby representing that Cornelius was buying this property subject to the rights of Cacy and his grantees. This must be the conclusion reached both from the recital in the deed and the representations made by Cornelius when procuring the approval of the deed.

Such conclusion is supported by this court in a long line of decisions, beginning with Higbee v. Aetna Bldg & Loan Co., 26 Okla.

327, 109 Pac. 236, and including Jones v. Perkins, 43 Okla. 734, 144 Pac. 183, and Midland Savings & Loan Co. v. Neighbors, 54 Okla. 626, 154 Pac. 506.

The court, speaking through Mr. Justice Hardy, in the case of United States Bond and Mortgage Co. v. Keahey, 53 Okla. 176, 155 Pac. 557, stated as follows:

"Where one purchases land subject to a mortgage thereon, the land conveyed is effectually charged with the incumbrance to the same effect as if the purchaser had expressly assumed the payment of the debt, or had himself made a mortgage on the land to secure it; and under such circumstances, the purchaser will not be permitted to question the validity of the mortgage on the ground that it was void as to his grantor."

By applying the law as announced by the Supreme Court of the United States in the case of Moelle v. Sherwood, supra, Crane v. Lessee of Morris, supra, and the United States Bond and Mortgage Co. v. Keahey by our own court, Cornelius will not be permitted in a court of equity to dispute a deed, when he purchased under a state of facts that, in my mind, disclosed he purchased subject to the prior deed. In my judgment this one issue is decisive of the case at bar. I cannot agree that, under the facts in this case, the doctrine of relations is not applicable, unless we overrule the former decisions of this court where that doctrine was applied.

By the doctrine of relation is meant that principle by which an act done at a certain time is considered, by a fiction of law, to have been done at some antecedent time. It is usually applied where several proceedings are necessary to complete a particular transaction, the last proceeding, which consummates the transaction, being held by relation to take effect as of the date when the first proceeding was had. Lynch v. De-Bernal, 76 U. S. 315, 19 L. Ed. 714; Gibson v. Choteau, 80 U. S. 92, 20 L. Ed. 534; 24 A. & E. Ency. L. 275. The doctrine finds, perhaps, its most frequent application in connection with conveyances of real property, and is invoked for the promotion of justice and the protection of purchasers. While it will not be applied to defeat or impair the intervening rights or equities of innocent third persons who are strangers to the transaction, it will not be defeated as against subsequent grantees of the vendor who have actual knowledge of the situation or who may be charged with the notice thereof. 24 A. & E. Ency. L. 277. The doctrine has been applied in a number of cases involving Indian titles, as appears from the following cases: Almeda Oil Co. v. Kelly, 35 Okla. 525. 130 Pac.

931; Scioto Oil Co. v. O'Hern, 67 Oklahoma, 169 Pac. 483; Pickering v. Lomax, 145 U. S. 310, 36 L. Ed. 716; Lomax v. Pickering, 173 U. S. 26, 43 L. Ed. 601; Lykins v. McGrath, 184 U. S. 169, 46 L. Ed. 485; Anchor Oil Co. v. Gray, 257 Fed. 277; Barnett v. Kunkel, 259 Fed. 394.

This court, in the case of Scioto Oil Company v. O'Hern, supra, reviews the cases of Almeda Oil Co. v. Kelly, supra, and Pickering v. Lomax, 145 U. S. 310, 37 L. Ed. 716, and Lykins v. McGrath, 194 U. S. 169, and in applying the doctrine of relations the second syllabus is as follows:

"Where C., a full-blood Creek citizen, executed an oil and gas lease upon his allotted land, which lease was filed in the office of the United States Indian agent, Union Agency, at Muskogee, and C. died before its approval by the secretary of the interior, and the heirs of C. thereafter conveyed said lands by deed duly approved by the county court, after which said lease was approved by the secretary of the interior, held, that the approval related back to the date of the lease, and the grantors in the deeds by the heirs of C. take title subject to said lease."

An examination of the facts in the case of Scioto Oil Co. v. O'Hern disclosed the following material facts: Albert Cooper, a full-blood citizen of the Creek Nation, executed an oil and gas lease on his allotment August 16, 1912, to John M. Ingram, which lease was thereafter assigned to the Scioto Oil Company. The lease was filed August 23, 1912, with the United States Indian agent, Union Agency, at Muskogee, for the purpose of securing the approval of the secretary of the interior and was approved by the secretary of interior December 20, 1912. Prior to the approval of said oil and gas lease, Albert Cooper died, on September 15, 1912, leaving as his sole and only heirs Sam Cooper and John Cooper, each of whom inherited an undivided one-half interest in said land. On September 27, 1912, Sam Cooper conveyed his one-half interest in said land to W. W. Fox, which deed was approved by the county judge of Tulsa county, October 1, 1912; John Cooper, on December 2, 1912, executed a deed to his one-half interest in the premises to W. W. Fox, which was approved by the county judge of Tulsa county December 2, 1912. On December 9, 1912, W. W. Fox and his wife conveyed the land to T. S. O'Hern. It will be noticed that the deeds of the Coopers to Fox were approved by the county court of Tulsa county prior to the time the lease of Scioto Oil Company was approved by the secretary of the interior.

It appears from the record that O'Hern purchased the premises prior to the time

the Scioto Oil Company's lease was approved, and the court found in that case that Fox and O'Hern took title without actual notice of the execution of said lease upon which the Scioto Oil Company claimed, still this court said that they had constructive notice, and having taken with constructive notice, the doctrine of relation would apply. If the doctrine of relation would apply in the case where the party has constructive notice, how can we say that it will not apply in a case where the grantee places in his deed the following statement:

"Whereas, Mollie Tiger and Babie Cumsey, nee Barnett, did on the 13th day of January, 1914, execute a quitclaim deed to John Z. Cacy for all of said lands above described."

And where the grantee, in having his deed approved, makes the following statement to the court:

"Mr. McDougal: And if these parties sold to John Z. Cacy, I don't see that that's any reason, from the standpoint of the full-blood heirs themselves—if they have any interest left and want to sell it and get $1,000.00 for it, I don't think the probate attorney should object."

And also made the further statement:

"Mr. McDougal: They are buying whatever interest these parties may have, if they have any. If they have any—and it's a very serious question in my mind whether they have any interest at all—if they have any, then the extent of it is not questioned. It does specify that it conveys all their interest, whatever that may be, but as to the extent of it, they don't know and nobody else knows. That's the question; they are satisfied to take the money that's offered to them for whatever contingent interest they may have."

In my judgment there is no way to reconcile the opinion of the majority with the case of Scioto Oil Co. v. O'Hern. The facts in the present case are so much stronger than in the O'Hern case; in the instant case Cacy and his grantees had been for four or five years in open and notorious possession, and in the O'Hern case no possession of the premises was ever taken by the Scioto Oil Company.

The deed in the instant case and the statement by counsel for Cornelius state they have actual notice of this deed to Cacy; certainly it cannot be said that the force and effect of the party who has constructive notice is more effective than the party who has actual notice.

It is suggested that Cacy was negligent in not having his deed approved. This, in my opinion, is immaterial in determining whether the doctrine of relations applied, or whether a subsequent purchaser who takes with actual notice of a prior deed takes subject to said deed. It is not a question of time or delay; it is simply a question of notice and of the equities. From an examination of the facts, I do not believe that it can be said that Cacy was negligent in not having his deed approved, nor can I infer that he did not intend to have his deed approved. At the time of taking his deed, it was contended by the secretary of the interior that the land was unrestricted and that by reason of section 22 of the act of Congress of April 26, 1906 (chapter 1876, 34 St. L. 137), the adult heirs of deceased Indians might sell the inherited land when the same was unrestricted. This was the opinion of the Attorney General of the United States at that time and of the secretary of the interior, and this contention was supposed to be supported by the opinion of the Supreme Court of the United States in the case of Mullins v. U. S., 224 U. S. 448, and this contention was approved June 17, 1916, when the federal district court, in the cases of Younken v. David, 235 Fed. 621, and Harris v. Bell, 235 Fed. 626, held that it was unnecessary to have the deed of a full-blood heir approved by the county court, and that the approval of deeds was only applicable to the lands allotted to the members of the tribe, although these two cases were later reversed by the Circuit Court of Appeals in 250 Fed. 208 and 209.

It must be remembered also that this court, in the case of Miller v. Fryer, decided December 2, 1912, 35 Okla. 145, 128 Pac. 713, held that the champerty and maintenance statute applied in cases of this kind and character, and that in that case a deed executed by a person out of possession, who had not collected the rents and profits for more than one year, was void as to the party in possession. The record also discloses that Cornelius, at the time of having his deed approved, was claiming an interest in the land by reason of an oil and gas lease executed August 1, 1913, and he in that proceeding was claiming that the lands were unrestricted and it was unnecessary to have the lease approved by the Secretary of the Interior. Can it be said, under such circumstances, that Cacy, or his grantees, were guilty of such laches, as would prevent him from invoking a defense; that Cornelius purchased subject to his deed? I do not think so. It was suggested that Cornelius, at the time of taking his deed and having the same approved, was simply taking a gambler's chance, but, by applying the rule of law adopted in the case of Randolph v. Quidnick. 135 U. S. 475, and Miss. & Mo. R. R. Co. v

Cromwell, 91 U. S. 643, that a court of equity will not lend its hand or aid or assist in enforcing gambling or speculative rights.

In regard to the equities in the case, the opinion of the majority recites the fact that Cornelius paid $1,000 for his quitclaim deed, and prior to that time he had paid $125 for an oil and gas lease, and that Cacy had paid $1,000 for his deed, and leaves the presumption the equities are equal. This, in my judgment, is not the correct way of determining the equities. The record discloses that Cornelius paid $1,000 for his quitclaim deed, at the time the land was worth from $20,000 to $100,000. His deed recites the fact that he had an oil and gas lease upon the premises, and had assigned a portion thereof, for what consideration the record does not disclose. It was asserted in the oral argument it was for a large consideration; but, whether it was or not, the consideration paid for the oil and gas lease should not be considered, for he had disposed of the same or a portion of the same.

Now, the equities upon the other side are that John H. Cacy purchased this land in 1911 for $1,000, when it was appraised at $900, and a short time thereafter he sold the same to his brother, John Z. Cacy, for $1,200, possession was taken of the land, improvements made thereon, and the land was cultivated, and he or his grantees had been in possession and were in possession up to the time of the trial of this case.

At the time John Z. Cacy purchased for $1,200 the land had no oil value. He sold a portion thereof. Grimes and Lancaster paid $7,000 for their interest a short time prior to the time Cornelius' received his deed. The records show that John Z. Cacy, at the time Cornelius had his deed approved, had no interest in the land, or, if so, a very small interest, but that this grantee who was claiming through him, and all of them, had paid a valuable consideration. When John Z. Cacy purchased the land from Fannie Fulsom, it was presumed that she owned it all. When the same became valuable, numerous heirs became interested, and he purchased from them all.

The record discloses that not only had Cacy and his grantees paid the $1,000, but additional sums in settling the suit wherein the common grantors were parties and in settlement of the claim of their attorneys. From the record, to me it does not appear there is any comparison of the equities in the case.

I therefore disagree with the opinion: First, for the reason that the majority opinion held that the record of the county court was introduced for a special purpose. Second, conceding that the record was introduced for a special purpose, which was to call the attention of the county court to the fact that the original grantors had executed a prior deed to Cacy, and considering the record for that purpose, it brings the case within the rule announced by the Supreme Court of the United States in the cases of Moelle v. Sherwood and Morris v. Peter, supra, that Cornelius's deed was subject to the rights of Cacy; then, by applying the rule of our court in the long line of decisions holding as in Bond and Mortgage Co. v. Keahey, having purchased the land subject to the deed of Cacy, he cannot question the validity of Cacy's deed. Third, by applying the rule announced in the case of Scioto Oil Co. v. O'Hern, supra, Cornelius, having taken his deed with actual notice of the prior deed to Cacy takes the land subject to said deed, and the deed of Cacy relates back to the date of its execution. Fourth, the equities being in favor of Cacy and his grantees, a court of equity under the facts in this case will not lend its aid to assist a party in purchasing such a speculative title.

Having reached this conclusion, I therefore dissent from the opinion of the majority.

I am authorized to announce that Mr. Justice PITCHFORD concurs in this dissenting opinion.